**UNITED STATES of America,
Plaintiff–Appellee**

v.

**INCO BANK & TRUST CORPORATION,
Defendant–Appellant.**

No. 87–3057.

United States Court of Appeals,
Eleventh Circuit.

May 20, 1988.

Theodore Klein, Fine, Jacobson, Schwartz, Nash, Block & England, P.A., Miami, Fla., for defendant-appellant.

W. Thomas Dillard, U.S. Atty., David L. McGee, Asst. U.S. Atty., Tallahassee, Fla., for plaintiff-appellee.

Before TJOFLAT and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

PER CURIAM:

This appeal presents the question whether a member of a criminal conspiracy that takes place both in the United States and in a foreign country can be convicted of engaging in the conspiracy if he performs no overt act within the United States. We answer the question in the affirmative.

Inco Bank & Trust Corporation is a Cayman Islands bank; it does business with and maintains accounts at several banks in Florida, but is not otherwise present in the United States.[1] The indictment in this case charged that Inco Bank and others conspired in the Northern District of Florida and elsewhere to defraud the United States, in violation of 18 U.S.C. § 371 (1982).[2] Specifically, the indictment charged that Inco Bank and its confederates created a money-laundering operation designed to smuggle[3] cash money—the proceeds from narcotics sales—from the United States to the Cayman Islands and to

---

1. Inco Bank, however, has conceded that the district court has jurisdiction over its person.

2. Section 371 provides in pertinent part:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

3. United States customs laws require any person transporting more than $10,000 in cash out of the United States to file a Currency and Monetary Instrument Report (CMIR), disclosing the source and the destination of the cash. *See* 31 U.S.C. § 5316 (1982 & Supp. II 1984). Thus, in order to keep the money-laundering operation secret, the conspirators planned to transport the cash out of the United States without filing a CMIR.

return the money to the drug traffickers in the United States in a form that would conceal the source of the money and would enable the traffickers to avoid payment of federal income taxes.

At trial, the Government's proof established the allegations of the indictment, which Inco Bank does not dispute. Rather, its argument is that the district court should have instructed the jury to return a verdict of not guilty because the evidence failed to show that Inco Bank committed any act in furtherance of the conspiracy within the United States. In support of its argument, Inco Bank cites cases which have suggested that the government may be precluded, under principles of international law, from prosecuting a conspiracy occurring outside the United States, such as on the high seas.[4] As we explain below, the conspiracy in this case occurred partly within the United States; thus, these cases are plainly inapposite, and we ignore them.

The conspiracy was instigated by a Tennessee lawyer, Ronald Hedges, and an accomplice, Gene Plemons, who let it be known to the underworld that they had expertise in laundering drug money. Agents of the Federal Bureau of Investigation (FBI) learned of their solicitation and set up a sting operation to snare them. In time, Hedges and Plemons met an undercover FBI agent posing as a drug trafficker, who told them that he had $400 million in drug money that he wanted laundered. Hedges and Plemons agreed to launder the cash, and went to the Cayman Islands to find a bank that would cooperate. There, the Sergeant at Arms of the Cayman Islands Legislative Assembly, Bert Watler, introduced them to Christopher Bain, the president of Inco Bank, and Bain volunteered the bank's services for a one percent fee. Hedges and Plemons accepted the bank's offer, and Inco Bank joined their conspiracy.

To carry out their scheme, the conspirators needed to engage someone with an airplane to smuggle the drug money from the United States to the Cayman Islands. Watler introduced them to Edward Bodden, the owner of Executive Air Services, Ltd., and Bodden agreed to supply the necessary airplane. He was to fly the cash to the Cayman Islands, where it would be deposited at Inco Bank in the account of a shell corporation and, in turn, transferred by Inco Bank to the account of a Delaware corporation in the United States. The conspiracy came to an end when Bodden flew to Opa Locka, Florida, to pick up a load of cash and was arrested by federal agents.

It is well settled that the government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States. See Ford v. United States, 273 U.S. 593, 620–24, 47 S.Ct. 531, 540–41, 71 L.Ed. 793 (1927); United States v. Lawson, 507 F.2d 433, 445 (7th Cir.1974), cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975); United States v. Correa–Negron, 462 F.2d 613, 614 (9th Cir.1972). In this case, the conspiracy began in the United States, and although it spread to the Cayman Islands, the conspiracy continued to function in the United States after Inco Bank joined it. In fact, Inco Bank joined the conspiracy knowing that it would continue to operate in United States territory. Clearly, the Government had the power to

4. In support of its argument that the district court should have directed a verdict, Inco Bank cites a number of authorities discussing the government's limited "extraterritorial" jurisdiction to prosecute crimes committed outside the United States. See, e.g., United States v. Wright–Barker, 784 F.2d 161 (3d Cir.1986); United States v. Columba–Colella, 604 F.2d 356 (5th Cir.1979); Restatement (Second) of Foreign Relations Law § 402 (Tent.Draft. No. 6, 1985); Blakesley, United States Jurisdiction over Extra-territorial Crimes, 73 J.Crim.L. & Criminology 1109 (1982). None of these authorities concludes that a conspiracy occurring partly within the United States can be prosecuted only under the government's extraterritorial jurisdiction; in fact, in his article, Professor Blakesley concludes just the opposite: that a conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction. See Blakesley, supra, at 1130–32.

prosecute Inco Bank.[5]

AFFIRMED.

---

**5.** Inco Bank claims, alternatively, that the district court committed reversible error in not instructing the jury that it could acquit the bank if it found that the bank committed no acts in the United States in furtherance of the conspiracy. As we indicate in the text, such an instruction would have been contrary to the law.