UNITED STATES of America, Appellee,

v.

David S. McKEEVE, Defendant,
Appellant.

No. 96–2273.

United States Court of Appeals,
First Circuit.

Heard Nov. 6, 1997.

Decided Dec. 5, 1997.

Daniel L. Sharp, with whom Elaine Whitfield Sharp and Whitfield, Sharp & Sharp were on brief, for Defendant, Appellant.

Despena Fillios Billings, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for Appellee.

Before SELYA, Circuit Judge, ALDRICH, Senior Circuit Judge, and BOUDIN, Circuit Judge.

SELYA, Circuit Judge.

Defendant-appellant David S. McKeeve assembles a litany of alleged errors in protest of his conviction and sentence. His flagship claim requires us to investigate the circumstances under which the Confrontation Clause allows a prosecution witness to testify by foreign deposition over the defendant's objection. After carefully considering this issue (a matter of first impression in this circuit) and assaying the appellant's other points, we affirm.

## I. BACKGROUND

Mindful of the appellant's challenge to the sufficiency of the evidence, we limn the facts in the light most flattering to the jury's verdict. *See United States v. Staula*, 80 F.3d 596, 599 (1st Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 156, 136 L.Ed.2d 101 (1996).

The appellant and his business partner, Shelagh McNeil, both citizens of the United Kingdom, operated McNeil International, Ltd. (MIL), a company organized under the laws of Scotland. Through it, the pair brokered various export transactions. In 1994, Peter Sullivan, the owner of Afromed (a Maltese firm), approached the appellant about acquiring a large quantity of computer equipment for the Libyan government. McKeeve agreed to handle the transaction and began to investigate its logistical aspects.

McKeeve contacted the United Kingdom's Department of Trade and Industry (DTI) to ascertain whether British authorities would require him to obtain an export license to ship computer equipment from the United Kingdom to Libya. DTI advised him that he probably needed such a license, and at some point, a DTI official also informed him that most computer equipment shipped to Libya wound up in munitions factories. Hot on the heels of this contact, Eric Lane, an investigator for British Customs, paid the appellant a visit. Lane stated that U.S. restrictions on trade with Libya were more stringent than those of the United Kingdom, and advised McKeeve that he should confer with U.S. Customs if he contemplated exporting computer equipment from the United States.

During the fall of 1995 the appellant designated a Massachusetts firm, New England Computer Exchange (NEXL), as the vendor of choice to supply the $300,000 worth of computer equipment needed to fill Afromed's order. When NEXL's representatives (Cliff Rucker and Deepak Jain) learned that the appellant wanted to transship the equipment through Cyprus—a notorious clearinghouse for goods destined for embargoed countries—they expressed concern about the ultimate resting place of the computer equipment. The appellant prevaricated and told them that the goods were bound for Ethiopia.

McKeeve and McNeil proceeded to instruct their stateside shipping agent, Peabody and Lane (P & L), to arrange shipment only as far as Cyprus. Simultaneously, they directed a British shipping agent, Alex Redpath, to arrange freight forwarding to Libya and, when Redpath warned that the U.S. trading embargo posed potential difficulties, the appellant merely reiterated the instruction.

On October 12, 1995, the appellant oversaw the packing of the computer equipment at NEXL's warehouse in Reading, Massachusetts. A trucker delivered the goods, in a shipping container, to port in Charlestown, Massachusetts. Acting on a tip, the U.S. Customs Service ordered the container held at port. Because this delay threatened to undercut the letter of credit that Afromed had produced to pay for the goods, the appellant flew to Malta and met with Sullivan.

At about the same time, the appellant instructed P & L to discharge the computer equipment in Antwerp, Belgium (a port through which it already was scheduled to pass en route to Cyprus). When a P & L agent informed McNeil about this change, McNeil advised her to maintain Cyprus as the port of final destination. The appellant subsequently confirmed McNeil's instruction.

Despite these machinations, the computer equipment stayed put. Although it originally was due to depart Charlestown on October 18, it remained on customs hold a full week later. On October 25, McNeil contacted NEXL's chief executive and stated that if he (Rucker) did not sign the Shipper's Export Declaration (SED), a U.S. Customs export document that lists, among other things, the ultimate destination of the goods, no payment would be forthcoming. McNeil transmitted an unsigned SED to Rucker that listed "Cyprus, Greece" as the port of unloading and Greece as the country of ultimate destination. Rucker called McNeil to report the apparent discrepancy and McNeil instructed him to delete Greece and insert Ethiopia as the country of ultimate destination. Rucker made the requested changes, signed the SED, and transmitted a facsimile to McNeil. Notwithstanding the newly executed SED, the customs hold endured.

On October 31, the U.S. Customs Service became convinced that the appellant sought surreptitiously to export goods to Libya. A customs agent, posing as a seaport supervisor, convinced the appellant to return to Boston and address a paperwork snafu that ostensibly prevented vacation of the customs hold. During a meeting with undercover customs agents, captured on videotape, the appellant vouchsafed that the computer equipment was destined for Ethiopia and signed a false SED. Shortly thereafter, the authorities arrested him and seized the computer equipment.

A federal grand jury indicted the appellant on charges that he knowingly violated the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706 (1994), and its associated Executive Orders and regulations, Exec. Order No. 12,924, 3 C.F.R. 917 (1994) & Exec. Order No. 12,543, 3 C.F.R. 181 (1986), both reprinted in 50 U.S.C. § 1701 note; 31 C.F.R. § 550.202 (1997); 15 C.F.R. §§ 774.1, 785.7(a), 787.3(a), 787.6 (1997); conspired to violate IEEPA, 18 U.S.C. § 371 (1994); and made false statements to the U.S. Customs Service, 18 U.S.C. § 1001 (1994). The grand jury also indicted McKeeve's and McNeil's corporation, MIL, on several related counts, but did not charge it with participating in the conspiracy. The bill named McNeil as an unindicted coconspirator, but neither she nor Sullivan was named as a defendant (presumably because they were beyond the court's jurisdiction).

At trial, the appellant admitted that Libya always had been the intended destination for the computer equipment. Nevertheless, he professed that he only belatedly became aware that his actions might violate U.S. law and that, when he learned of the problem, he tried to "slow down" the transaction by discharging the equipment in Antwerp for eventual sale in the United Kingdom. He attempted to explain away his false claim that Ethiopia was the country of ultimate destination as a standard broker's business practice designed to mask his customer's identity.

The jury weighed the evidence, concluded that the appellant knew all along that U.S. law prohibited the transaction, and convicted him on all counts. The jury also found MIL guilty as charged. The district court sentenced both defendants, but only McKeeve perfected an appeal.

## II. THE FOREIGN DEPOSITION

■ The appellant objects in this court, as he did below, to admission at trial of the deposition testimony of the British shipping agent, Alex Redpath. His cardinal contention is that the admission of this evidence abrogated his rights under the Confrontation Clause. We exercise plenary review over this claim of constitutional error. *See United States v. Stokes,* 124 F.3d 39, 42 (1st Cir. 1997).

### A. *Setting the Stage.*

The parties—who agree on little else—share the view that Redpath was a key witness. Initially, the prosecution gained Redpath's assurances that he would travel to the United States and testify at the trial. As the day of reckoning approached, Redpath experienced a change of heart. Because the district court lacked subpoena power over Redpath (who lived and worked in Great Britain), the government moved for leave to depose him abroad. The motion invoked a procedural rule that provides in pertinent part:

Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition....

Fed.R.Crim.P. 15(a).

The government proposed to mitigate any Confrontation Clause issues by transporting the appellant and his counsel to the site of the deposition and videotaping the proceedings. This proposal proved problematic for two reasons. First, the U.S. Marshals Service lacks jurisdiction to retain custody of federal detainees on foreign soil and the Central Authority of the United Kingdom would not agree to assume temporary custody of McKeeve so that he could attend the deposition.[1] Second, British magistrates typically prohibit the videotaping and audiotaping of depositions, and made no exception in this instance. The district court nonetheless found that Redpath was an unavailable witness and that the interest of justice warranted the deposition. Working within the spare confines of the British scheme, the court directed the government to transport the appellant's attorney to the deposition and to install two telephone lines—one that would allow the appellant to monitor the deposition from his prison cell and another that would allow him to consult privately with counsel during the deposition. The court reserved a ruling on the Confrontation Clause objections until the time of trial.

Redpath's deposition was taken before a British magistrate in the Solihull Magistrates' Court, Birmingham, England. Lawyers for the government and for both defendants attended and questioned the deponent. A solicitor (who doubled in brass as the clerk of the Magistrates' Court) contemporaneously prepared a transcript. The appellant monitored the proceedings by means of a live telephone link. At the conclusion of the session, the solicitor certified the transcript as accurate and forwarded it to the district court. When the prosecution subsequently offered the deposition at trial, Judge Keeton

---

1. The appellant asserts that the government did not make a bona fide effort to facilitate his attendance at Redpath's deposition. The record, which includes the correspondence between the two governments, refutes this assertion.

overruled the appellant's objections and allowed the government to read it into evidence.

## B. *The Legal Landscape.*

■ The use of deposition testimony in criminal trials is disfavored, largely because such evidence tends to diminish a defendant's Sixth Amendment confrontation rights. *See, e.g., United States v. Drogoul,* 1 F.3d 1546, 1551 (11th Cir.1993); *United States v. Mann,* 590 F.2d 361, 365 (1st Cir.1978). But the shrinking size of the globe means that certain criminal activities increasingly manifest an international cachet and, because federal courts frequently lack the power to compel a foreign national's attendance at trial, Rule 15 may offer the only practicable means of procuring critical evidence. The resultant tension between the defendant's Confrontation Clause rights and the prosecution's need to obtain evidence from persons domiciled abroad, while new to this circuit, threatens to become a recurring theme.

The various subsections of Rule 15 govern the method and manner by which depositions in criminal cases are to be taken. The appellant tacitly concedes that the taking of Redpath's deposition did not contravene the rule's formal requirements. Nevertheless, compliance with Rule 15 is a necessary, but not sufficient, condition to the use of a deposition at trial. The admissibility of the testimony is quite another matter. *See* Fed. R.Crim.P. 15(e). The appellant cloaks himself in the mantle of the Confrontation Clause and makes his stand at this juncture.

■ The Confrontation Clause's "central concern ... is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 3163, 111 L.Ed.2d 666 (1990). The Clause addresses that concern principally by affording a criminal defendant the right to confront appearing witnesses face to face and the right to conduct rigorous cross-examination of those witnesses. *See Coy v. Iowa,* 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988); *Pennsylvania v. Ritchie,* 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987); *see also Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537–38, 65 L.Ed.2d 597 (1980) (discussing the Confrontation Clause's "preference for face-to-face confrontation"). Ordinarily, then, when the government purposes to introduce a deposition at trial in lieu of live testimony, a defendant has the right to be present during the deposition so that he may confront the deponent. *See Christian v. Rhode,* 41 F.3d 461, 465 (9th Cir.1994); *Don v. Nix,* 886 F.2d 203, 206 (8th Cir.1989).

■ Withal, we know on the best of authority that the Confrontation Clause cannot be applied mechanically, but, rather, must be interpreted "in the context of the necessities of trial and the adversary process." *Craig,* 497 U.S. at 850, 110 S.Ct. at 3166. In other words, the right of confrontation is not absolute. Yet, filtering constitutional concerns through a seine woven of practical necessity is a tricky business, and different situations likely will yield different accommodations.

■ When the government conducts a Rule 15 deposition in a foreign land with a view toward introducing it at trial, the Confrontation Clause requires, at a minimum, that the government undertake diligent efforts to facilitate the defendant's presence. *See United States v. Kelly,* 892 F.2d 255, 262 (3d Cir.1989); *United States v. Salim,* 855 F.2d 944, 950 (2d Cir.1988). We caution, however, that although such efforts must be undertaken in good faith, they need not be heroic, and the possibility of using a deposition does not evaporate even if those efforts prove fruitless. In that event the district court must determine, on a case-specific basis, whether reasonable alternative measures can preserve adequately the values that underpin the defendant's confrontation rights. In cases where actions by, or the laws of, a foreign nation effectively preclude the defendant's presence, furnishing the defendant with the capability for live monitoring of the deposition, as well as a separate (private) telephone line for consultation with counsel, usually will satisfy the demands of the Confrontation Clause. *See United States v. Mueller,* 74 F.3d 1152, 1156–57 (11th Cir.

1996); *Kelly*, 892 F.2d at 260; *Salim*, 855 at 950.

## C. *The Appellant's Constitutional Challenge.*

In this case, the record reveals that the prosecution made reasonable and diligent efforts to secure the appellant's attendance at Redpath's deposition: it offered to defray the cost of transporting the appellant and his counsel to the deposition and requested that British authorities accept temporary custody of him to ensure his presence. Only a lack of cooperation by the host nation stymied the appellant's appearance, and the Justice Department was powerless to coerce British assistance. The appellant points to nothing more that the prosecution plausibly could have done to facilitate a face-to-face confrontation. What is more, when the British authorities balked, Judge Keeton fashioned a reasonable alternative, and the prosecution provided the requisite telephonic links between the appellant's prison cell and the Solihull Magistrates' Court. Under the prevailing circumstances, the government's efforts to secure (or, alternatively, to approximate) a face-to-face confrontation were constitutionally adequate.

This finding, in itself, does not defeat the appellant's constitutional challenge. Face-to-face confrontation in a courtroom setting has yet another virtue; it permits the trier of fact better to observe a witness's demeanor. *See Craig*, 497 U.S. at 846, 110 S.Ct. at 3163–64; *Drogoul*, 1 F.3d at 1552. Like the right of confrontation itself, however, this value is not absolute. Thus, even when a witness is unavailable to testify at trial, the Clause countenances the admission of certain extrajudicial statements as long as they possess sufficient indicia of reliability. *See Roberts*, 448 U.S. at 65–66, 100 S.Ct. at 2538–39; *Puleio v. Vose*, 830 F.2d 1197, 1205 (1st Cir.1987).

For this purpose, "[r]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception." *Roberts*, 448 U.S. at 66,

100 S.Ct. at 2539. So it is here: Fed.R.Evid. 804(b)(1) limns a hearsay exception for former testimony of an unavailable witness. This exception's roots are deeply embedded in American jurisprudence. *See, e.g., Mattox v. United States*, 156 U.S. 237, 240–44, 15 S.Ct. 337, 338–40, 39 L.Ed. 409 (1895). Consistent with this tradition, courts seem disinclined to find any Confrontation Clause transgression when the prosecution offers deposition testimony under this rule. *See, e.g., Ecker v. Scott*, 69 F.3d 69, 71 (5th Cir. 1995); *Kelly*, 892 F.2d at 261–62; *Salim*, 855 F.2d at 954–55. We join these courts and hold that evidence properly within the former testimony hearsay exception is, by definition, not vulnerable to a challenge based upon the Confrontation Clause.

To bring Redpath's testimony within the protective embrace of this holding, the government had to make a threshold showing (1) that the witness was unavailable, and (2) that the deposition constituted former testimony. The appellant contests both points.

The standard test for unavailability is whether the witness's attendance could be procured "by process or other reasonable means." Fed.R.Evid. 804(a)(5). In a criminal context, however, Confrontation Clause concerns color the Rule 804 availability inquiry and heighten the government's burden. *See Ecker*, 69 F.3d at 71–72. Thus, the prosecution must actively attempt to secure the witness's presence at trial. *See Christian*, 41 F.3d at 467. Here, as we noted above, the government made an assiduous effort to convince Redpath to attend the trial. We fail to discern any further action that the prosecutor reasonably could have taken to bring the witness before the jury.

The remaining question is whether Redpath's deposition amounted to "former testimony" within the purview of Fed.R.Evid. 804(b)(1). The appellant's objection on this score is a bare assertion that the method of transcribing the proceeding was "slow and inexact."[2] We must balance this complaint

---

2. The appellant offers no convincing examples of any inexactitude. His only supporting datum is

an unamplified statement by counsel for MIL, as follows: "There is one particular phrase that

against the dominant characteristics of the deposition, namely, the administration of an oath; unlimited direct and cross-examination by attorneys for all parties; the ability to lodge objections; oversight by a judicial officer; the compilation of the transcript by a trained solicitor; and the lack of a language barrier.

█ To be sure, the deposition did not comport in all respects with American practice, but that circumstance alone does not render the testimony not "in compliance with law" and therefore beyond the reach of Rule 804(b)(1). We agree with the Second Circuit that "unless the manner of examination required by the law of the host nation is so incompatible with our fundamental principles of fairness or so prone to inaccuracy or bias as to render the testimony inherently unreliable, ... a deposition taken ... in accordance with the law of the host nation is taken 'in compliance with law' for purposes of Rule 804(b)(1)." *Salim,* 855 F.2d at 953. The British proceeding substantially jibes with our practice and thus satisfies the rule.

█ The appellant's final plaint is that the Redpath deposition was not videotaped. History undermines this plaint. The former testimony exception to the Confrontation Clause predates the development of videotaping technology by nearly a century. *See Mattox,* 156 U.S. at 240–44, 15 S.Ct. at 338–40. Thus, the exception obviously does not envision the need to present the trier of fact with a video recording of the declarant's testimony. In a case like this one—where the host nation prohibits videotaping—the district court's refusal to condition its authorization of the deposition on the use of such a technique did not offend the Constitution.

We hasten to add, however, that our opinion should not be read to discourage the use of videotaped depositions in this type of situation. Having the trier of fact observe the testimonial demeanor of the witness enhances important Confrontation Clause values, including the perception of fairness in criminal trials. *See Craig,* 497 U.S. at 846,

110 S.Ct. at 3163–64; *Coy,* 487 U.S. at 1018–20, 108 S.Ct. at 2801–03. For these reasons, although videotaping is not constitutionally required, we urge the district courts, if videotaping is feasible, to give serious consideration to granting defendants' requests to employ the technique.

To sum up, the Redpath deposition satisfies the Rule 804(b)(1) standard. Moreover, the very characteristics which contribute to that conclusion—e.g., administration of an oath; unlimited direct and cross-examination; ability to lodge objections; oversight by a judicial officer; compilation of the transcript by a trained solicitor; and linguistic compatibility—also provide sufficient indicia of reliability to assuage any reasonable Confrontation Clause concerns. *See Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539; *Salim,* 855 F.2d at 954–55. The district court did not err in admitting the deposition testimony into evidence.

## III. THE CONSPIRACY CONVICTION

The appellant launches a barrage of nearly unthirlable arguments directed toward his conviction for conspiracy to violate IEEPA. These arguments land well wide of the mark.

█ IEEPA codifies Congress's intent to confer broad and flexible power upon the President to impose and enforce economic sanctions against nations that the President deems a threat to national security interests. *See United States v. Arch Trading Co.,* 987 F.2d 1087, 1093–94 (4th Cir.1993). Included in the President's IEEPA authority is the right to prohibit persons from engaging in commercial transactions with such hostile foreign nations. *See* 50 U.S.C. § 1702(a)(1)(B). The appellant reads this provision as applying only to persons who are subject to the jurisdiction of the United States. He then posits that as neither of his supposed accomplices fell within the territorial jurisdiction of the United States when the events at issue transpired—McNeil and Sullivan are domiciliaries of the United Kingdom and Malta, respectively, and neither of them entered the United States during the rele-

has—that is a crucial question that I remember going in as a different question." The specific

question and answer never have been identified.

vant time frame—they could not in terms violate IEEPA. A person cannot conspire with himself, the appellant's thesis runs, and to suggest that McNeil and Sullivan were coconspirators in this matter implies that IEEPA's reach extends extraterritorially—a result inconsonant with both the statutory text and the traditional presumption against extraterritoriality. *See United States v. Nippon Paper Indus. Co.*, 109 F.3d 1, 3 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 685, —— L.Ed.2d —— (1998). Based on this reasoning, the appellant concludes that any agreement among McNeil, Sullivan, and himself concerning the exportation of computers to Libya cannot form the basis for a conspiracy conviction.

This theory is both procedurally and substantively infirm. As a matter of procedure, the theory makes its debut in McKeeve's appellate brief, and "[i]f any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir.1992). There are no excusatory circumstances here.

Despite this procedural default, we could still, as a matter of discretion, review the argument for plain error. *See United States v. Taylor*, 54 F.3d 967, 972 (1st Cir.1995). But so detailed a review is unnecessary here, for there is no error, plain or otherwise. The appellant's theory overlooks a critical component of IEEPA's framework. Among other things, IEEPA expressly confers on the President the power to prohibit commercial transactions with certain foreign nations "with respect to any property ... subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1). The computer equipment around which the conspiracy centered was stored in Massachusetts and unquestionably subject to the jurisdiction of the United States. Accordingly, as long as either McNeil or Sullivan knew the locus of the equipment and knew that U.S. law prohibited

its export to Libya,[3] the ensuing agreement with the appellant had an unlawful design sufficient to animate the federal conspiracy statute.

In the case at hand, the government adduced ample proof of both propositions. The record contains abundant evidence that McNeil, at least, was aware of U.S. export restrictions and purposefully sought to evade them. Of particular note are her successful efforts to coerce Rucker into signing an SED that falsely described the ultimate destination of the goods and her countermanding of the suggestion that the goods be discharged in Antwerp. In addition, the nisi prius roll shows beyond hope of contradiction that the appellant performed an overt act in furtherance of the conspiracy when he purchased the equipment from NEXL in Massachusetts and attempted to ship it to Libya. McKeeve's purchase supplied the final piece of proof needed to ground a conviction on the conspiracy count. *See Ford v. United States*, 273 U.S. 593, 620, 47 S.Ct. 531, 540, 71 L.Ed. 793 (1927) (holding that, when a conspiracy "was directed to violation of the United States law within the United States by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy ... all are guilty of the offense of conspiring to violate the United States law whether they are in or out of the country"); *United States v. Inco Bank & Trust Corp.*, 845 F.2d 919, 920 n. 4 (11th Cir.1988) (per curiam) (noting "that a conspiracy occurring partly within the United States is prosecutable without resort to any theory of extraterritorial jurisdiction"); *Rivera v. United States*, 57 F.2d 816, 819 (1st Cir.1932) ("The place of the conspiracy is immaterial provided an overt act is committed within the jurisdiction of the court."). No more is exigible.

## IV. OTHER ALLEGED TRIAL ERRORS

The appellant raises a host of issues that relate loosely to his oft-repeated claim that

---

**3.** To support the conviction, the government only needed to prove that the appellant conspired with one other person. *See United States v. Josleyn*, 99 F.3d 1182, 1190 (1st Cir.1996), *cert.* denied, —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997). The government never alleged that MIL was a coconspirator, so our choice is limited to McNeil or Sullivan.

he did not receive a fair trial. Individually, these issues are insubstantial, and in combination they produce no synergistic effect.

### A. *Admission of Sullivan's Statement.*

■ In a protest that harks back to his sufficiency challenge, the appellant takes umbrage with the district court's decision to admit, over his objection, evidence of certain out-of-court statements allegedly made by Sullivan to third parties. The statements, as recounted by Redpath, specifically linked the appellant to Sullivan; showed that Sullivan acted throughout with a view toward transshipping the computer equipment through Cyprus to Libya; and undermined the appellant's testimony that his attempt to off-load the equipment in Antwerp was not a ruse, but, rather, a sincere effort to abort the transaction once he became aware that it would violate U.S. law. We customarily review decisions to admit or exclude evidence for abuse of discretion, *see United States v. Houlihan*, 92 F.3d 1271, 1296 (1st Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997), and we follow that praxis here.

The trial court admitted the challenged evidence on the authority of Fed.R.Evid. 801(d)(2)(E), which creates an exception to the hearsay rule for extrajudicial statements "by a coconspirator of a party during the course and in furtherance of the conspiracy." The appellant's principal objection to the court's action stems from his extraterritoriality argument. We previously rejected that argument, *see supra* Part III, and the theory that undergirds it fares no better in an evidentiary context.

■ The second prong of the appellant's objection suggests that the government did not adduce sufficient evidence of Sullivan's involvement to bring his statements within the reach of Rule 801(d)(2)(E). This prong rests on an impeccable legal foundation. An out-of-court statement of a non-testifying coconspirator is admissible under Rule 801(d)(2)(E) only if the district court supportably finds that "it is more likely than not that the declarant and the defendant were members of the conspiracy when the hearsay statement was made, and that the statement

was in furtherance of the conspiracy." *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir.1977); *accord United States v. Ortiz*, 966 F.2d 707, 715 (1st Cir.1992).

■ Factually, however, the objection falls flat. The government showed that Sullivan headed Afromed; that his name appeared on numerous documents created pursuant to the transaction; that he was in constant contact with the appellant regarding the status of the project (including the customs hold); and that he was responsible for arranging transshipment of the goods to the Libyan purchaser. The record also shows that, while in the United States, the appellant sent Sullivan a memo that advised Sullivan to use extreme caution in contacting him and to be very careful what he said in any such communication. In light of this evidentiary predicate, the district court had a reasonable basis for concluding that, more likely than not, McKeeve and Sullivan were coconspirators and that Sullivan's comments to Redpath were made during and in furtherance of the conspiracy. Consequently, the decision to admit Sullivan's hearsay statements under the coconspirator exception did not constitute an abuse of discretion.

### B. *Admission of Lane's Testimony.*

■ During trial, Eric Lane, a British customs official, testified that the appellant spoke to him anent DTI's earlier warning that virtually all computers sent to Libya ended up in arms factories. The appellant objected to this testimony on relevancy grounds and added that, to the extent the testimony might otherwise be admissible, it was unduly prejudicial. He argued then, and reasserts now, that since U.S. law bans the export of any product (except certain humanitarian aid) to any Libyan entity, the fact that a DTI official had warned him that computer shipments would be used to outfit Libyan arms factories is irrelevant to any crime charged in the indictment. For its part, the government points to the appellant's admission that he knew all along that the U.S. embargo at least paralleled United Nations sanctions (which explicitly prohibit the sale of equipment destined for Libyan military applications), and that, in light of this admis-

sion, Lane's testimony tended to undercut the appellant's claim that he did not realize the Afromed transaction transgressed U.S. law.

The district court accepted the government's position, but told the jury that it could consider the proffered testimony only with regard to McKeeve's state of mind (i.e., whether he plotted to contravene the Libyan embargo in knowing violation of IEEPA) and not for the truth of the matter asserted. We review this decision for abuse of discretion. *See Houlihan*, 92 F.3d at 1297. We detect no abuse either in the trial court's decision to admit Lane's testimony as probative of McKeeve's state of mind or in its refusal to exclude the proffer under Fed.R.Evid. 403.

▋ The relevancy objection requires scant comment. Fed.R.Evid. 401 deems relevant evidence that has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The instant indictment charged the appellant with knowingly and willfully violating, and conspiring to violate, IEEPA. His state of mind, assessable only by indirect proof, *see United States v. St. Michael's Credit Union*, 880 F.2d 579, 600 (1st Cir.1989), was of critical importance to the resolution of these charges. When, as now, the prosecution offers evidence bearing on an inherently subjective inquiry, the relevancy threshold is at its lowest. *See United States v. Tierney*, 760 F.2d 382, 387 (1st Cir.1985). Seen in this light, Judge Keeton reasonably could conclude—as, indeed, he did—that McKeeve's knowledge of the likely end use of the computer equipment tended to make less probable his state-of-mind defense. Hence, the judge did not err in admitting the statement.

The Rule 403 objection is similarly unavailing. That rule directs a trial court to exclude relevant evidence if, *inter alia*, "its probative value is substantially outweighed by the danger of unfair prejudice." But almost all evidence is meant to be prejudicial—why else would a party seek to introduce it?—and it is only unfairly prejudicial evidence that must be banished. *See United States v. Rodriguez-Estrada*, 877 F.2d 153, 156 (1st Cir.

1989). Although the Lane testimony may have prejudiced the appellant in the sense that it fit, tongue and groove, into the prosecution's theory of the case, there is nothing unfair about the jury's weighing of it for the limited purpose of determining the appellant's state of mind. For this reason, we decline the appellant's invitation to second-guess the district judge's evidentiary gravimetry. *See Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1340 (1st Cir.1988) ("Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect.").

### C. *Admission of Harmon's Testimony.*

▋ The appellant also cries foul in respect to a statement made at trial by David Harmon, a Treasury Department official, to the effect that the U.S. embargo against Libya resulted from a presidential determination that Libya supports international terrorism. Because the appellant did not lodge a contemporaneous objection to this testimony, we ordinarily would review his belated challenge for plain error. *See United States v. Griffin*, 818 F.2d 97, 99–100 (1st Cir.1987). Here, however, the circumstances obviate any need to engage in plain error review. *See United States v. Castro–Lara*, 970 F.2d 976, 981 n. 5 (1st Cir.1992) (explaining that, if no error inheres, plain error review becomes a superfluous step).

The government called Harmon to establish the existence and effect of the economic sanctions imposed against Libya. Harmon's description of the purpose behind the embargo provided the jury with relevant background information that helped to stitch together an appropriate context in which the jury could assess the evidence introduced during the trial. Admitting Harmon's statement was well within the realm of the district court's discretion. *See, e.g., Castro–Lara,* 970 F.2d at 981; *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.1988). Trials are meaty affairs, and appellate courts should not insist that all taste be extracted from a

piece of evidence before a jury can chew on it.

### D.  *Prosecutorial Misconduct.*

The appellant's next assignment of error is predicated on a claim that the prosecutor overstepped her bounds during opening and closing arguments. This claim is a superscription that grows out of the prosecutor's references to Lane's testimony in her opening statement and to Harmon's testimony in her summation. Because the prosecutor, on each occasion, did no more than describe accurately testimony that the jury would hear or already had heard, the assignment of error fails. At least in the absence of highly exceptional circumstances (not present here), a comment by counsel in the course of jury summation that merely recounts properly admitted testimony, accurately and without embellishment or distortion, cannot constitute reversible error. *See Jentges v. Milwaukee County Circuit Court*, 733 F.2d 1238, 1242 (7th Cir.1984). So, too, a comment in the course of an opening statement that merely presages subsequently admitted testimony cannot constitute reversible error. *See id.*

## V.  SENTENCING

The district court sentenced the appellant to a prison term of 51 months, the low end of the applicable guideline sentencing range (offense level 24; criminal history category I). Salvaging scant succor from this fact, the appellant strives to persuade us that the court made two material errors in its sentencing calculations. We are unconvinced.

### A.  *Evasion of National Security Controls.*

With respect to export control offenses, the sentencing guidelines provide for a base offense level (BOL) of 14 unless "national security or nuclear proliferation controls were evaded," in which case the BOL escalates to 22. USSG § 2M5.1(a). The lower court found that the offense of conviction qualified for the eight-level enhancement. The appellant claims that this ruling is based on an erroneous reading of the enhancement provision. Because this claim implicates the meaning and scope of the guideline, our review is plenary. *See United States v. Muniz*, 49 F.3d 36, 41 (1st Cir.1995).

The appellant's core contention is that USSG § 2M5.1(a)(1) cannot apply in a sale-of-goods case unless the government presents evidence that the particular goods, when or if sold, constitute an actual threat to national security. We disagree. In Executive Order No. 12,543, the President determined that Libya posed an "unusual and extraordinary threat to the national security and foreign policy of the United States" and therefore ordered an embargo covering the exportation of virtually all goods to Libya. The embargo is an exercise of executive power authorized by IEEPA "to deal with any unusual and extraordinary threat ... to the national security." 50 U.S.C. § 1701. In short, the embargo is intended as a national security control.

That ends the matter. As we read it, section 2M5.1(a)(1) applies to any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods shipped actually are intended for some innocent use. *See United States v. Shetterly*, 971 F.2d 67, 76 (7th Cir.1992). The appellant's argument to the contrary seeks to substitute the judgment of a factfinder for that of the executive branch, which has made a determination that the export of any goods to Libya, excepting only certain humanitarian aid, threatens national security interests. Such a course is fraught with separation-of-powers perils, *see Department of the Navy v. Egan*, 484 U.S. 518, 527, 108 S.Ct. 818, 823–24, 98 L.Ed.2d 918 (1988) (noting the primacy of presidential power to protect national security interests), and we eschew it.

### B.  *Obstruction of Justice.*

The appellant's remaining complaint is equally unavailing. At the disposition hearing, the district court increased the appellant's BOL for obstruction of justice. *See* USSG § 3C1.1. The court based this two-level enhancement on a finding that McKeeve committed perjury when he testified that he

did not know his actions violated U.S. law. We review a sentencing court's factbound finding of perjury for clear error. *See United States* v. *Akitoye,* 923 F.2d 221, 229 (1st Cir.1991).

Before imposing an obstruction of justice enhancement predicated on perjurious testimony, a sentencing court must survey the trial evidence to ascertain whether it establishes that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan,* 507 U.S. 87, 94, 113 S.Ct. 1111, 1116, 122 L.Ed.2d 445 (1993). The court's findings need not be precise to the point of pedantry. While separate findings as to each element are preferable, the sentencing court's determination is sustainable so long as it "encompasses all of the factual predicates." *Id.* at 95, 113 S.Ct. at 1117. This is such a case.

The appellant does not challenge the materiality component of the district court's determination. Rather, he concentrates his fire on the finding of falsity. He cites language that once appeared in the Sentencing Commission's commentary, USSG § 3C1.1, comment. (n.1) (Nov. 1995) and earlier editions, to the effect that in applying section 3C1.1 "in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant," and claims that the sentencing court erred by failing to consider his testimonial statements accordingly.

The most recent version of the guidelines deleted this language, *see* USSG App. C, amend. 566 (Nov.1997), but it was zoetic at the time of the appellant's sentencing, and he is therefore entitled to its benefit. *See United States* v. *Harotunian,* 920 F.2d 1040, 1041–42 (1st Cir.1990). But, this circumstance does not profit McKeeve. His suggested reading of the language would allow "the safeguard [to] swallow the rule in a single gulp," *Akitoye,* 923 F.2d at 228, and we long have rejected it. In its heyday the now-discarded language never required sentencing courts to resolve all evidentiary conflicts to the defendant's benefit. Thus, a sentencing court required to apply that language today need only construe allegedly perjurious statements in a defendant-favorable way if such statements are genuinely ambiguous or if the record, after credibility determinations have been made, plausibly supports an innocent interpretation. *See United States v. Clark,* 84 F.3d 506, 510 (1st Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 272, 136 L.Ed.2d 195 (1996).

Here, the overwhelming weight of the credible evidence contradicted the appellant's professions of ignorance. Numerous witnesses testified to incriminating statements and conduct that occurred before the appellant claims he became aware of possible legal problems. This evidence strongly supports a finding that the appellant knew all along that his actions were illegal. In these circumstances, the obsolete language is inapposite and the district court's finding of perjury is unimpugnable.

The supportability of this finding likewise defeats the appellant's related claim that the two-level enhancement punished him for exercising his constitutional right to testify in his own defense. That right, though precious, does not include a right to commit perjury. *See Dunnigan,* 507 U.S. at 96, 113 S.Ct. at 1117–18.

## VI. CONCLUSION

We need go no further. To the extent that the appellant rolls out other arguments, they are plainly inadequate and do not warrant discussion. The short of it is that, in colloguing to sell computer equipment to Libya, McKeeve spun a tangled international web that ultimately ensnared its creator. For that conduct, he was lawfully indicted, fairly tried, justly convicted, and appropriately sentenced.

*Affirmed.*