UNITED STATES of America

· v.

NIPPON PAPER INDUSTRIES CO., LTD., formerly Jujo Paper Co., Ltd. Defendant.

No. Cr. 95–10388–NG.

United States District Court, D. Massachusetts.

July 28, 1998.

Alan M. Cohen, O'Melveny & Myers LLP, New York City, Ian Simmons, Jeffrey W. Kilduff, O'Melveny & Myers, Washington, DC, William H. Kettlewell, Dwyer & Collora, Boston, for Nippon Paper Industries Co., Ltd, Defendants.

Lisa M. Phelan, U.S. Department of Justice, Washington, DC, for U.S.

### ORDER

GERTNER, District Judge.

## I. INTRODUCTION

This case involves an issue at the intersection of the Constitution's Confrontation Clause on the one hand, and advanced courtroom technology, on the other. In this criminal antitrust action, the Government sought to take the testimony of a critical witness in Japan through either a videotaped deposition pursuant to Fed.R.Crim.P. 15 or through the use of simultaneous video teleconferencing—two different techniques for recording testimony with different implications. The witness, Mr. Shigeru Hinoki ("Hinoki"), refused to come to the United States to testify; although he was a cooperating witness,[1] the

---

1. Mr. Hinoki's company, Honshu Paper Co., now    Oji Paper Co., entered into a plea agreement

Government lacked the means to compel his presence in the courtroom. *See United States v. Filippi*, 918 F.2d 244, 247 (1st Cir. 1990)("The government has no power to compel the presence of a foreign national residing outside the United States.")

In response, the defendant objected to the Government's motion for permission to take testimony by video deposition pursuant to Rule 15, but agreed to video teleconferencing, presumably since some of the defendant's own potential witnesses were located in Japan and could be questioned effectively using the same technology.

On May 4, 1998, I granted the Government's Motion for Permission to Take Testimony by Video Teleconference. I did not, however, permit simultaneous transmission of Mr. Hinoki's testimony in front of the jury. For the reasons described below, I allowed the video teleconferencing of the witness from the U.S. embassy in Tokyo between the hours of 6:00—9:30 p.m. EST, but the proceedings were taped, edited and replayed before the jury during normal court hours.

## II. *PROCEDURAL POSTURE*

The defendant, Nippon Paper Industries, Co. ("NPI") was charged with being part of a conspiracy of Japanese manufacturers to fix prices for thermal fax paper exported to the United States. After four weeks of trial, and seven days of deliberations, the jury was unable to reach a verdict. Since the issues raised by this case are likely to recur— whether in a subsequent trial of the defendant or another case involving similar questions—I have spelled out my reasons in this decision.

## III. *BACKGROUND*

A videotaped deposition involves an off site deposition of a witness, recorded via videotape and transcribed by a court reporter.

The deposition is attended by counsel for both sides who raise objections and examine the witness. The tape can be edited, and, if the Court rules that the witness' testimony is admissible, all or some of the videotape is played before the jury during trial.

Video teleconferencing offers many of the same advantages of a videotaped deposition—the jury connects a face to words, absorbs the context of questions and answers, and gains a purchase on his or her testimony that is absent without the immediacy of their image—but with additional characteristics. It enables an off-site witness to testify "live" during a trial, to be examined in real time by the lawyers, with the trial judge presiding, in front of the jury.

The Government was content with a videotaped deposition, video teleconferencing or some combination of the two. NPI was amenable only to simultaneous video teleconferencing. A videotaped deposition, it contended, would deprive NPI of a meaningful opportunity to confront Hinoki in violation of the Sixth Amendment. The defendant argued that Hinoki had given equivocal answers to the Government in prior interviews. NPI was concerned that without judicial oversight, the prosecution would be able to employ repetition and leading questions to shape the witness' testimony outside the presence of the jury. And since the deposition was pretrial, the Government could test out one approach and if unavailing, try another at trial.

As an alternative, NPI proposed video teleconferencing of both parties' witnesses as a means of simulating "live" testimony while avoiding some of the transglobal travel associated with bringing Japanese witnesses to a trial in Boston. The video teleconference would occur after the trial had begun, with trial judge oversight and in front of the jury. *See Defendant's Response to Motion of Unit-*

with the Government on April 2, 1996. *See Memorandum of United States in Support of Its Motion for permission to Take Testimony by Video Teleconference or By Video Deposition Pursuant to Fed.R.Crim.P. 15, Att. B*. That agreement required Mr. Hinoki to "cooperate fully with the United States in the conduct of any grand jury or other federal criminal investigation involving alleged antitrust violations in the thermal paper industry,

and in any criminal litigation or other related criminal proceeding arising or resulting therefrom. This cooperation shall include, but is not limited to ... obtaining the agreement and continuing cooperation of Mr. Hinoki ... to testify in any criminal litigation... " Notwithstanding these representations, Mr. Hinoki declined to come to the United States for reasons related to his poor health.

ed States to Take Testimony by Video Teleconference or by Video Deposition Pursuant to Fed.R.Crim.P. 15.

## IV. ANALYSIS

### 1. Confrontation Rights and the Formality of the Courtroom

■ I begin my analysis with the context in which the Government made its request. The defendant, a Japanese corporation, is charged in a U.S. federal court with a *criminal* antitrust violation. As such, it is entitled to the same rights of confrontation as any U.S. defendant.

The Confrontation Clause is an essential part of the criminal trial's truth seeking function. It assures the right of the accused, "in all criminal prosecutions . . . to be confronted with the witnesses against him." An important premise of the criminal justice system is that the truth is more likely to emerge with face to face communication between accused and accuser, played out before the fact-find-er,[2] in this case, the jury.[3] Equally important is the formality that attaches to the ceremony, the robed judge, the witness' oath, the public's scrutiny, the creation of an appellate record formed in a moment experienced simultaneously by all parties.

That right of confrontation and those formalities were especially important in this case. NPI was alleged to have been a co-conspirator in a foreign-based conspiracy designed to fix prices for thermal fax paper sold in the United States. While in any price fixing case the difference between agreeing to set prices and setting prices independently may be a matter of nuance and emphasis, in this case subtle distinctions were complicated by cultural and language differences. Many of the witnesses, including Mr. Hinoki, were native Japanese speakers and required interpreters. Most of the documents relied on by the parties were in Japanese. Both the written record as well as the spoken word were challenged by translators for the defense and for the prosecution.[4]

2. *See Dutton v. Evans*, 400 U.S. 74, 89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

3. Scholars have debated the origins and breadth of the Confrontation Clause. In *White v. Illinois*, 502 U.S. 346, 359, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), the United States argued as amicus curiae that the purpose of the Confrontation Clause was to prevent trial by ex parte affidavits. Justice Thomas, concurring, agreed with the Government citing to 16th Century English practice. In 16th century England, magistrates interrogated witnesses without affording the defendant a right to be present or to engage in cross examination. Predictably, the trial devolved into the mere reading of depositions or confessions; the defendant did not "confront" his accusers in any setting. *White*, 502 U.S. at 361, 112 S.Ct. 736 (Thomas, J., *concurring*).

In *Mattox v. United States*, 156 U.S. 237, 242, 15 S.Ct. 337, 39 L.Ed. 409 (1895), one of the early Confrontation Clause decisions, the Supreme Court noted that ("[t]he primary object of the [Confrontation Clause] was to prevent depositions or ex parte affidavits, such as were sometimes admitted in civil cases, being used against the prisoner in lieu of personal examination and cross examination of the witness . . .") *Id.* In *Mattox*, the Court acknowledged that another purpose of the clause is to guarantee that the accused has an opportunity, not only to test the recollection of the witness in an out of court setting, but also to compel him to stand face-to-face with the jury so that they may look at him, and evaluate his demeanor. *Id.* 156 U.S. at 242–

43, 15 S.Ct. 337. This broader purpose was endorsed by the Supreme Court in *White*, and *Maryland v. Craig*, 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). Thus, the Confrontation Clause ensures (1) that the witness will give the testimony under oath, impressing upon the witness the seriousness of the matter and protecting against a lie by the possibility of penalty of perjury, (2) that the witness will be subject to cross-examination, and (3) that the jury will have the chance to observe the demeanor of the witness, which aids the jury in assessing credibility. *See Maryland v. Craig, supra* 497 U.S. at 851, 110 S.Ct. 3157 (1990), *citing California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970).

Other commentators suggest that the purpose of the clause was to constitutionalize criminal procedure as it then existed in the states, namely as an adversary system with defense cross examination at its core. *See* Randolph N. Jonakit, *The Origins of the Confrontation Clause: An Alternative History*, 27 Rutgers L.J. 77 (1995).

4. For example, the Government claimed that the word "Sando" in certain documents (allegedly memorializing meetings between Japanese manufacturers to fix prices for the U.S. market) should be translated as "agreement." The defense countered that "Sando" could be interpreted to mean "concurrence," a noun which would allow the jury to find that multiple manufacturers had made independent pricing decisions and had merely acquiesced in their competitors' approach.

To a degree, the presence of a translator already compromised the defendant's confrontation rights. While the jury heard the witness speaking in Japanese, immediately followed by the English translation, it was likely to miss the witness' intonations, his tone of voice, or the emphasis he placed on words in a sentence.[5]

At the same time, the government acknowledged that, in order to prosecute this case, some modification of a traditional trial setting—beyond translators—was essential. While American criminal law could reach Japan, *see United States v. Nippon Paper Industries, Co. Ltd.,* 109 F.3d 1 (1st Cir.1997), American process could not. The question became, "to what extent would confrontation rights be compromised because of the exigencies of an international antitrust litigation?"

### 2. *Videotaped Deposition.*

■ The case law and the rules allow the Court to compromise confrontation rights in very specific circumstances. Fed.R.Crim.P. 15 provides that a deposition of a prospective witness may be taken under "exceptional circumstances" subject to certain requirements.[6] It may be admitted under the former testimony exception, Fed.R.Evid. 804(b)(1) if it approximates trial conditions to a significant degree. In *United States v. McKeeve,* 131 F.3d 1 (1st Cir.1997), for example, the First Circuit sanctioned the admission of a deposition of an otherwise unavailable foreign witness, where the U.S. Government had attempted to secure face-to-face confrontation with the deponent in a

foreign country (Britain) but where the British authorities refused to comply, where the prosecution provided requisite telephonic links between the defendant's prison cell and the court in which the deposition was taken during the deposition, and where the deposition otherwise complied with confrontation standards, including the administration of an oath, unlimited direct and cross-examination, the ability to lodge objections, oversight by a judicial officer, the compilation of a transcript by a trained solicitor, and linguistic compatibility.

But while videotaped depositions have been admitted, they are plainly the exception and not the rule, notwithstanding the pressures. Clearly videotaped depositions are easier, more convenient. Few witnesses want to testify before a jury, under the pressure of a trial. Counsel often prefer to hear the testimony during a pre-trial dry run, rather than expose their witnesses' weaknesses before a jury. Indeed, excuses can always be found to avoid a court appearance. However, should these events occur with any regularity, trial by deposition would substitute for trial by confrontation, precisely what the Confrontation Clause was designed to avoid. *Stoner v. Sowders,* 997 F.2d 209 (6th Cir.1993).

This is especially true where the Government chooses, as here, to prosecute a foreign defendant for violations of American law. It should be anticipated that requests to use the technology to make up for face-to-face confrontation in an American court of law are likely to multiply. But, notwithstanding the increasingly global economy, and the utility

---

5. This point was emphasized during the Government's heated examination of Mr. Hinoki in which the prosecution's sharp language and tone were tempered by the time it took to translate questions, the cadence of the interpreter and the complexities associated with translating rhetorical questions into a language that is structured differently than English.

6. The rule provides:

(a) When taken. Whenever due to exceptional circumstances of the case it is in the interest of justice that the testimony of a prospective witness of a party be taken and preserved for use at trial, the court may upon motion of such party and notice to the parties order that testimony of such witness be taken by deposition and that any

designated book, paper, document, record, recording, or other material not privileged, be produced at the same time and place ....

\* \* \* \* \* \*

(d) How taken. Subject to such additional conditions as the court shall provide, a deposition shall be taken and filed in the manner provided in civil actions except as otherwise provided in these rules, provided that

(1) in no event shall a deposition be taken of a party defendant without that defendant's consent, and

(2) the scope and manner of examination and cross-examination shall be such as would be allowed in the trial itself.

of the new technology in litigating far flung claims, there are sound reasons for limiting its use.

In the instant case, the deposition the government proposed would not take place before a judicial officer in Japan; there were serious questions concerning the witness' reliability; and major concerns about translation.[7]

The fact that the Government requires the assistance of videotaped depositions in order to prosecute international cases is not sufficient to make it constitutional. In this, as in other criminal cases, the demands of efficiency and even necessity, do not create automatic exceptions to Constitutional requirements. Whatever the need, we do not have the option to substitute videotaped depositions for live testimony on a regular basis. The Sixth Amendment stands firmly in the way. While some argue that videotaping is just like the real thing, "just like" is not, in most situations, good enough. The fact that we have the technology to take depositions in this fashion does not mean that we should. As one court noted:

> In the most important affairs of life, people approach each other in person, and television is no substitute for direct personal contact. Video tape is still a picture, not a life, and it does not come within the rule of the confrontation clause which insists on real life where possible, not simply a close approximation. *Stoner*, 997 F.2d at 213.

Put in more modern parlance, I, though an avid supporter of the "Courtroom of the Future," with a courtroom equipped with every manner and means of high tech accoutrements, believe that we should be cautious about the technology lest we begin to practice "virtual justice."

### 3. Video Teleconferencing

With the defendant's concurrence, the Government proposed conducting the video teleconference in front of the Court and jury, during the trial, subject to cross examination by the parties. That procedure would provide a judicial officer and obviate one of the concerns associated with standard depositions; as the very judge hearing the case, I would preside over the testimony as it was elicited. The problem of unfairly shaping trial testimony in advance would be minimized since the testimony would be taken mid-trial, after the Government had already committed to a theory of the case. Real time testimony would provide the Court with the simultaneity of a live witness.

Nevertheless, notwithstanding the advantages of video teleconferencing, especially as compared with videotaped depositions, had serious concerns. The testimony of the witness would still be mediated via videoscreen. Studies have suggested that television and videoscreens necessarily present antiseptic, watered down versions of reality.[8] Much of the interaction of the courtroom is missed.[9]

Despite the acceptance of closed circuit testimony in certain, particularized cases,[10] these issues might have counseled rejecting

---

7. After the mistrial, the jury made it quite clear that they had a difficult time understanding Mr. Hinoki with the combination of Japanese translation and videoscreen.

8. *See* Gerbner et al., 1994; Lichter, Lichter, and Rothman, 1994, *cited in* Schrum and Wyer Jr., *The Effects of Television Consumption on Social Perceptions: The Use of Priming Procedures to Investigate Psychological Processes*, 24 J. of Consumer Res. 447 (1998).

9. In a telling scene in the movie "Twelve Angry Men," the jurors were discussing the testimony of an old man who claimed to have heard a fight in the apartment above him, and then a loud noise, like a body hitting the floor. He reported that he ran to his apartment door just in time to see the defendant running down the stairs. One of the jurors, himself an elderly man, reminded the others about the way the elderly witness had walked to the stand before testifying; dragging one of his feet, he walked in a labored fashion, his gait slowed by some disability. It was an observation that would have been missed if the only aspect of the witness that the jurors saw was his face.

10. *See, e.g., Maryland v. Craig,* 497 U.S. 836, 850, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)(sanctioning the use of closed circuit television to transmit testimony of child witness in sex abuse case when "necessary to further an important public policy" and where "the reliability of the testimony is otherwise assured"); *U.S. v. Gigante,* 971 F.Supp. 755 (E.D.N.Y.1997)(permitting physically ill government informant witness to testify at RICO trial by closed circuit television).

video teleconferencing had the defendant not effectively waived its objections. NPI, after all, agreed with video teleconferencing of witnesses. Thus, the ultimate propriety of video teleconferencing did not need to be resolved.

■ One problem remained. The defendant insisted that the jury be present during the video teleconference with the witness, the Court and counsel. "Real time" video teleconferencing presented extraordinary logistical problems: The witness was in Tokyo, Japan, which is 13 hours ahead of Boston time. Moreover, the Government represented that the witness was infirm and would not be able to appear for his testimony in the middle of the night; the earliest he could appear was at 7:30 a.m. or 6:30 p.m. Boston time.

I declined to ask the jurors to stay into the evening, or to require that they travel to and from the courthouse at night. Since the defendant had already waived the principal components of its Confrontation Clause rights by agreeing to the appearance of witnesses through a videoscreen, I held that he had also waived the right to confront the accuser in "real time." Under the circumstances, that one additional component—having that encounter occur in front of the jury—was not constitutionally compelled. If exceptional circumstances justified the admission of a videotaped deposition in *McKeeve*, an inferior technology, then it surely justified the admission of the taped video teleconferencing in this case. The resulting procedure was a constitutional hybrid, borrowing from the precedent associated with Rule 15 videotaped depositions, marrying it to the advantages of video teleconferencing.

I therefore **ORDERED** that the testimony of Mr. Hinoki be taken in the evening between 6:30 and 9:30 p.m., that counsel be present to cross examine, that the Court rule on all objections as if the testimony were being conducted before the jury and that the conference be taped and edited for later transmission to the jury. The Government's Motion for Permission to Take Testimony by Video Teleconference or By Video Deposition Pursuant to Fed.R.Crim.P. 15 [document # 135] is **ALLOWED**.

**SO ORDERED.**