*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0213p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
————————————

UNITED STATES OF AMERICA,
                        *Plaintiff-Appellee,*

       *v.*

DAWN HANNA,
                        *Defendant-Appellant.*

Nos. 09-1425/2086

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 07-20355-001—Marianne O. Battani, District Judge.

Argued: March 11, 2011

Decided and Filed:  August 12, 2011

Before:  KEITH, McKEAGUE, and KETHLEDGE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** N.C. Deday LaRene, LaRENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant. Michael C. Martin, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.  **ON BRIEF:** N.C. Deday LaRene, LaRENE & KRIGER, P.L.C., Detroit, Michigan, for Appellant.  Michael C. Martin, Barbara L. McQuade, ASSISTANT UNITED STATES ATTORNEYS, Detroit, Michigan, for Appellee.

————————————

## OPINION

————————————

McKEAGUE, Circuit Judge.  Defendant Dawn Hanna was indicted on multiple counts for shipping telecommunications and navigation equipment to Iraq, in violation of the embargo implemented by Executive Order 12722 and the International Emergency Economic Powers Act.  Prior to trial, the district court denied Hanna's motion to suppress certain evidence gathered through warrants.  The government sought and was

granted a protective order to prevent disclosure of certain confidential documents to the defense. The district court also excluded testimony from a defense witness, Juan Otero. Hanna was ultimately convicted on all but one count of the indictment. The district court found her sentencing range to be 188-235 months, but in its discretion only imposed concurrent sentences of 72 months. Hanna then filed a Motion for New Trial based on newly-discovered information, which she contended also demonstrated a *Brady* violation. However, the court denied the motion, stating that the evidence did not undermine establishment of the offense elements, or provide an affirmative defense.

Multiple issues are raised on appeal. We conclude that the trial court did not err in denying Hanna's motion to suppress information gathered from warrants in the case, and that any error in excluding Otero's testimony was harmless. We find no error in the district court's addition of the sentencing enhancement for an offense "involving . . . national security." We conclude, however, that the district court did err in its sentencing calculation, but not for the reasons Hanna asserts. The court improperly sentenced Hanna under U.S.S.G. § 2S1.1(a)(2), but because this action was induced by Hanna, it is invited error and does not warrant reversal. Lastly, no *Brady* violations occurred in this case, and Hanna's newly-discovered evidence does not meet the standard for a new trial. Therefore, we **AFFIRM**.

## I.  BACKGROUND

Defendant Dawn Hanna worked as a director of sales at Technology Integration Group Services ("TIGS"), a family business. During this time, an embargo was in effect under United States law, which prohibited virtually all trade with Iraq. No United States citizen was allowed to engage in such trade without first obtaining approval from the Secretary of Treasury, tasked with implementing this embargo by granting licenses on a case-by-case basis. The law imposed criminal penalties for individuals who violated this embargo, and Hanna admits she knew about the embargo.

In 2001, Hanna's father (an Iraqi citizen) brought her a request for quotations for a cellular phone system to be built in Baghdad. Hanna testified that she believed that

this tender was on an approval list for a program called "Oil for Food," which allowed shipment of goods in certain circumstances but still required the requisite license. Hanna prepared a quotation for the project, faxed the proposal to Baghdad, and won the tender. She worked on this deal with a man named Emad Al-Yawer and his company, ATS. She claims she eventually learned that she could not legally supply this equipment, and withdrew from that transaction. She then proceeded to negotiate, arrange, and complete several other shipments of items from and through various places, all ultimately going to Iraq, in violation of the embargo. She claims, however, that she believed these were going to a customer of Al-Yawer, Dresser International, in Turkey. Stipulated testimony from Al-Yawer reflected this at trial, stating that Turkey was a ruse, and that while the equipment was intended for Iraq, Hanna was not a party to this deception. He claims that he "never told Dawn Hanna" and instead "told them, at all times, that Turkey was the intended final destination." However, Skyport Air Freight was the principal freight forwarding company for these transactions, and its owner-operator Charle Malas testified that Hanna initially told him the equipment was headed to Turkey, but later admitted it was destined for Iraq. Likewise, both a business associate and a friend of Hanna each testified that Hanna told them the equipment was headed for Iraq through Turkey, in order to evade the embargo.

It is undisputed that Hanna made "efforts to acquire and ship the GSM equipment which was the subject of the charges in the Indictment," and therefore her specific steps in planning these shipments will not be reviewed in detail. In summary, she secured shipments, had some items installed in shipping containers, and arranged for shipping through freight forwarders, principally Skyport. One ATS employee, who was once Hanna's fiancé, testified at trial that he arranged for the shipment of this equipment from Syria to Baghdad. Hanna and her associates located suppliers in the United Kingdom and Germany for their project in September 2002. They informed the suppliers that the equipment was headed to Turkey, purchased the equipment, and made four separate shipments to Iraq by way of Syria. To finance the transactions, TIGS received two wire transfers, totaling approximately $9.5 million, which was distributed to various people in the scheme, including Al-Yawer. A little over one million was kept by TIGS and

Hanna's family, as profit. These payments involved letters of credit, which stated that the equipment was destined for Turkey; additionally, TIGS submitted shipping records to the bank to obtain payment under these letters; these were also false. These acts were the basis for Count Eight of the Indictment, for Hanna's involvement in a money laundering conspiracy.

After the four successful shipments were accomplished, two more are relevant in this case. One TIGS shipment intended for ATS was seized by United States customs in February 2003, though this shipment did not contain telecommunications goods (this would later become the basis of Count Three, the only count for which Hanna was acquitted). Another shipment was seized by British Customs for lack of an export license in March 2003. Both countries' authorities began investigations, and Hanna gave statements to both. She denied to American investigators that any goods were bound for Iraq. She also originally denied knowing Al-Yawer. These statements were the basis of the false statement charge of Count Ten.

*ACQUISITION OF SEARCH WARRANTS*

On June 22, 2004, a magistrate judge issued two warrants in this case, both of which were premised on an affidavit of United States Immigration and Customs Enforcement (ICE) Special Agent Brian Wallace, which set forth the details of an investigation into suspected violation of the Iraqi trade embargo, involving both GSM and GPS technologies. The warrants, discussed in further detail below, were to search the TIGS business premises and files, and to search Hanna's AOL email account. The ten-page affidavit stated, among other things:

> • The investigation began with an interception of the TIGS shipment in February 2003. The shipment contained high-tech equipment, and was invoiced to "ATS Inc./Dresser" in Amman, Jordan, via Damascus, Syria.
>
> • A statement made by an ATS employee shortly before the Iraq war began in 2003, stating that the company's shipment of telecommunications equipment was going through London to be used in "an emergency, like war," at a time when war with Iraq was likely.

• Hanna's statement to British Customs officers that the goods in her shipment were passing through Syria and Jordan to a final destination in Turkey because they were free-trade zones and she could avoid paying duty. This was suspicious because Turkey was also a free-trade zone, making the claimed routes illogical.

• Hanna told Customs and FBI agents in Chicago that around ten percent of TIGS' business was foreign exports. She also told them she had previously done business with ATS, and that ATS was currently paying TIGS approximately five million dollars to purchase and export equipment to Jordan. She stated that the ultimate destination was Turkey, and that she did not know who the end user was.

• After British Customs informed TIGS that British government approval would be needed before telecommunications equipment there could be exported, TIGS promptly moved the equipment to another shipper for export to France.

• The shipment opened by British authorities contained the GPS equipment TIGS was exporting, as well as a box belonging to Yasir Rashid, an Iraqi national working for ATS. Rashid told agents that he believed the GPS equipment was going to Iraq, because ATS had an office in Baghdad, he (Rashid) is an Iraqi citizen who works primarily in Baghdad, he received expensive training on this equipment, and the Jordan seaport was already equipped with this equipment.

• An official Iraqi government memorandum found in Iraq after the fall of Baghdad indicated that ATS had a contract to provide the Iraqi government with 500 "receivers" during the same time frame as TIGS' past shipments to ATS.

• In a British Customs interview, Skyport stated it was hired to ship ten tons of telecommunications equipment for TIGS to Turkey via Syria, addressed to Dresser International. Hanna provided British Customs with the Turkey address for this shipment, but the address was determined to be an apartment complex. The affidavit also notes that the director of Skyport was Charle Malas.

• Hanna furnished documents to U.S. Customs officials pertaining to their letter of credit, which included, according to the affidavit, "an acceptance certificate that was issued and signed by Dresser International Group, Mr. Walied Al-Aly."[1]

---

[1] Key to the defendant's arguments is the fact that this document actually was signed "Walid Al-Ali," and was on Dresser International Group letterhead.

Most importantly, the affidavit stated that a trash search was conducted at the TIGS office, where a "letter" was found:

> An undated letter was found in the discarded trash . . . . The letter stated: "Dear Charles, I would like to take this opportunity to thank you for your help and support in shipping our goods to Iraq via Syria. Your contacts in Syria were most helpful in shifting the goods speedily and promptly, once again our thanks and appreciation. Now we are working on another deal with the new administration there and expect that we will start shipping goods again, we will have to wait for the airport to open, and will revert to you as soon as we have something going. . . . Sincerely yours, Walied Al-Aly."

The letter indicated a funding dispute, requiring repayment of funds "as you have been instructed on many occasions." The affidavit stated that "Walied Al-Aly is the name of an agent for Dresser International Group, which Darrin Hanna identified as the customer in the telecommunications equipment deal described above." It also gave reasons to believe that "Charles" was Charle Malas, director of Skyport, including explanations that memoranda and email printouts between Charle Malas and various TIGS personnel were recovered in the trash as well (some referring to him as "Charles"). Lastly, multiple printed emails discuss a payment disagreement between Skyport, TIGS, and Global Telecommunications, including emails from Hanna's personal AOL email account. Based on this affidavit, the magistrate judge granted two warrants. The first warrant authorized the seizure of "[a]ll stored electronic mail of any kind sent to, from, and through [Hanna's AOL email account], or associated with the user name Dawn Hanna or account holder Dawn Hanna, between January 2001 and the present," as well as business records and traffic data for that account.

The second warrant authorized the search of the TIGS office premises, and the seizure of various categories of "records and documents referencing or related to the purchase or sale of computer, telecommunication or related equipment and materials, for the period January 1, 2001, to the present." Specifically, it defined "records and documents" to include programs; emails; and applications or materials created, modified, or stored in any form. It also authorized search of business records (including quotes, correspondence, memoranda, invoices, shipping documents, export licenses, contracts,

etc.); applications for export licenses and regulations related to the license requirements; financial records (including banking statements, check books, deposit slips, wire transfers, credit card receipts, etc.); documents showing residency or dominion (keys, bills, rental agreements, mail envelopes, etc.); records of travel; and address or telephone books or papers reflecting names and contact information of customers and business associates. All of these were limited by the language "referencing or related to the purchase or sale of computer, telecommunication or related equipment and materials, for the period January 1, 2001, to the present."

This second warrant produced several pieces of material evidence used in the case. Primarily, emails between co-conspirators were recovered. Several were from Hanna (all from her work, not AOL, account) that had been sent to her co-conspirator, Al-Yawer, who she claimed had arranged the Iraq shipments but kept her in the dark, telling her they were going to Turkey. One email she sent to him stated they were "doing a job for Iraq that nobody on earth wants to touch because of politics." Another stated that "we are keeping confidential the nature of our project for obvious reasons," and that "[s]ome areas are blacklisted, as you well know . . ." One email stated that if she were caught, the authorities "would be at my doorstep with the department of commerce—and you would NEVER SEE ME AGAIN!!!" Another stated, "I want to do this job, but we have been getting sideways looks due to the climate and region. . . . People are nervous about the end destination at this point. But I have managed to work around it." The emails demonstrated Hanna's difficulty in finding suppliers due to the Iraq embargo, and that she was feeling "desperate" to find such suppliers. Perhaps most incriminating were emails that corroborated the government's theory that Hanna was knowingly hiding the true destination of the shipments. She emailed Al-Yawer asking for a "home made" document, showing that "your trading company has a license to install a mobile GSM system in JORDAN." She told him to "get creative. . . . I want to see how good the document reproduction efforts can be." She offered to "update it" to "[m]ake it look official." She stated that the license was needed to "show the vendors that when they ship to Jordan (we will handle the freight forward to destination location of use in IQ), someone qualified can work with the stuff."

*INDICTMENT*

On July 18, 2007, a federal grand jury returned an indictment against Dawn Hanna (and her brother, Darrin) including ten counts: Count One charged them with violation of 18 U.S.C. § 371 by conspiring to unlawfully export property to Iraq, in violation of 50 U.S.C. § 1705(b).  Counts Two through Seven charged them with individual substantive violations of 50 U.S.C. § 1705(b), including various shipments of equipment from the UK, Germany, and the United States to Iraq.  Count Eight charged both with money laundering conspiracy.  Count Nine charged forfeiture allegations.  Lastly, Count Ten charged Dawn Hanna with making false statements to United States Customs agents, in violation of 18 U.S.C. § 1001(a)(2).

*MOTION FOR PROTECTIVE ORDER*

Prior to trial, on January 24, 2008, the government filed a Motion for Protective Order, invoking the Classified Information Procedures Act ("CIPA"), 18 U.S.C. app. 3 § 4, and requesting the non-disclosure of certain allegedly classified information.  The government sought, and was granted, an *ex parte, in camera* hearing to review the evidence at issue.  Hanna requested but was denied any information regarding the nature of the evidence.  The district court reviewed the information and announced its decision to grant the protective order, stating its reasons on the record at the *in camera, ex parte* hearing.  At no time did the defendant receive any information regarding the contents of the withheld evidence.  The contents of the undisclosed evidence, transcript of the hearing, and explanation of the judge's decision, are still sealed but have been reviewed by this court.

*MOTION TO SUPPRESS*

On April 15, 2008, Hanna filed a motion to suppress any evidence or information obtained through the two search warrants.  She argued, as she does here, that the probable cause showing of the affidavit was predicated upon reckless or intentional misstatements of fact, and that the warrants were overbroad and insufficiently particular.  Specifically, she argued that contrary to the affidavit, "'Walied Al-Aly' is not the name

of an agent for Dresser International Group.'" Instead, Dresser's owner was Walid Al-Ali, as indicated by other letters in the government's possession—letters on Dresser letterhead, unlike the one in the trash. Therefore, she asserted, the letter found in the TIGS trash was not a letter at all, but "manifestly a fraud" and the agents knew or were recklessly indifferent to that fact. Lastly, she argued that the warrants were overbroad and should have been limited to searches involving foreign trade, or to certain filters on the "subject line and header" information on emails to only obtain communications on certain matters or from particular persons or places. The district court held a hearing on this motion in May, but ultimately denied the motion to suppress. The judge reasoned that the affidavit correctly quoted the letter, and that there was no evidence the affiant noticed the difference in spelling or thought it was significant. Therefore, the court found the distinction to be an "omission," not a "misstatement," and that "[n]egligence and innocent mistake are insufficient to overcome the presumption of validity."

*MOTION IN LIMINE*

Before trial, the government filed a motion in limine, moving to exclude certain testimony of Juan Otero. Otero was general counsel at a company called Stratex, which had done business with Dresser International. Otero would have testified that Dresser placed an order with Stratex's Dubai office in July 2002 for wireless transmission equipment. He would have produced the purchase order, signed by Walid Al-Ali, General Manager of Dresser, and by Al-Yawer, ATS Director. Most importantly, he would testify that Dresser told Stratex the equipment was intended for installation in Jordan, but they later discovered that it was ultimately destined for Iraq. However, Otero was not personally involved in this transaction; instead, he initiated the internal investigation of the shipments after British Customs alerted the company to the fact that some of their shipments may have been delivered to Iraq.

Hanna argued this information would have established that "the same people whom Dawn Hanna claimed had tricked her into believing that the electronic equipment she secured on their behalf was going to a place other than its true destination" had also tricked someone else "using similar documents and representations." She argued Otero's

conclusions that Stratex had no knowledge of the destination would be admissible as "lay opinion" testimony under Federal Rule of Evidence 701.

The government argued in its motion to exclude this testimony that the evidence was not relevant and was hearsay. The government contended that because Stratex never had any contact with TIGS or Hanna, and because the shipments for each company were entirely separate, Otero's knowledge or criminal intent would not be probative of the defendant's knowledge or criminal intent. More importantly, they argued that Otero had no personal knowledge of Stratex's dealings with Dresser; instead, his knowledge was based entirely on "emails and other documents that he reviewed in the course of his internal investigation." The government therefore argued that though "[t]hose documents may well fall under the business records exception to the hearsay rule," Otero could not be "called to testify to the knowledge of everyone at Stratex."

The district judge excluded the testimony on the basis of relevance. "I just don't see the relevance," she concluded. "Even if this company was duped, I don't see the relevance to these individual defendants who have a small company and are dealing individually with Mr. Yawer."

*TRIAL AND VERDICT*

At trial, the issues revolved around Hanna's knowledge and state of mind, as the offenses required her to know that she was shipping the equipment to Iraq. Her key defense was that she was unaware that the shipments were bound for Iraq, and instead believed them to be heading for Turkey.

On October 2, 2008, after a lengthy jury trial, Dawn Hanna was convicted on all charges except Count Six. Darrin Hanna was acquitted of all charges.

*SENTENCING*

After the jury found Hanna guilty, a Presentence Investigation Report (PSI) was prepared based on Hanna's money laundering offense, since that offense's guidelines were the highest. The PSI found an base offense level of 26 and a criminal history

category of I. However, it recommended several enhancements,[2] including a six-level upward adjustment to Hanna's money laundering offense level under United States Sentencing Guideline §2S1.1(b)(1)(iii), which provides that enhancement when "the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . an offense involving firearms, explosives, national security, or the sexual exploitation of a minor." U.S.S.G. §2S1.1(b)(1)(iii).

Hanna objected to this enhancement, arguing the record would not support such a finding, nor that any of the offense conduct did, or was intended, to threaten national security. She acknowledged that without this enhancement, her Sentencing Guideline range would have been 97 to 121 months.

The district court looked to United States Sentencing Guideline § 2S1.1(a) as the Presentence Report recommended.[3] However, because Appendix A of the Guidelines matched a § 1705 conviction with U.S.S.G. § 2M5.3 ("Providing Material Support or Resources to Designated Foreign Terrorist Organizations..."), the court concluded that section was inapplicable and that it was unable to determine the offense level for the underlying offense. The district judge therefore calculated the base offense level under § 2S1.1(a)*(2)*, requiring a calculation of "8 plus the number of offense levels . . . corresponding to the value of the laundered funds." Using a funding value of $3.3 million, the district judge added 8 and 18 for a base offense level of 26.

However, the district court rejected Hanna's argument regarding the national security enhancement, reasoning that "the defendant knew this was . . . an embargo. An embargo is basically a control device pursuant to the executive power as authorized in IEEPA, and it's not necessary that there be actual knowledge of a threat to security in

---

[2]The PSI also recommended a two-level enhancement for a conviction under 18 U.S.C. § 1956 (money laundering), pursuant to § 2S1.1(b)(2)(B), and two levels for obstruction of justice, pursuant to § 3C1.1. Neither of those is at issue in this appeal.

[3]Section §2S1.1 of the United States Sentencing Guidelines states that the base offense level must either be determined by (1) determining the offense level for the underlying offense, when "the offense level for that offense can be determined" [using Appendix A] or (2) "otherwise," by calculating "8 plus the number of offense levels from the table in § 2B1.1" according to the "value of the laundered funds." "Determination" of the level under subsection (1) is by reference to Appendix A and the corresponding match-ups of statutes and Sentencing Guideline sections. U.S.S.G. §2S1.1.

order to violate this." This added a six-level enhancement, bringing the level to 32. The district judge added an additional two-level enhancement for obstruction of justice, and another for the money laundering conviction, but declined the enhancement for "sophisticated" laundering. She therefore calculated an offense level of 36, and a Guideline range of 188 to 235 months. However, in her discretion, the court imposed a sentence below this range: concurrent sentences of sixth months each for the embargo conspiracy and false statements violations, and seventy-two months for each of the five embargo violations and money laundering conspiracy, again served concurrently. Overall, Hanna was to serve seventy-two months, or six years.

*MOTION FOR NEW TRIAL*

After trial and sentencing, the defense filed a Motion for New Trial. The motion was based on newly-acquired information that "suggested that agents of the Executive Branch of the United States had knowledge of the shipments which were the basis of the prosecution, and approved and encouraged them." Specifically, they filed a declaration of Kameran Mahmoud Attar, an ATS employee who had been in the Baghdad office, which stated that he and Al-Yawer had met with United States CIA agents in December 2002. Attar stated that the CIA knew about the shipments being arranged by ATS and TIGS, and had "told [him] that if [he] gave them the information they were seeking, they would help [ATS] complete the shipments." The defense also filed a declaration of Al-Yawer himself, who confirmed that American agents contacted him "sometime in 2002," and that he met with them about four times before March of 2003. Al-Yawer stated that a CIA agent told him in October 2002, "[w]e are not after you, we are not after anyone you are working with, nobody will get hurt, nothing will happen, we just want Saddam and his henchmen," and that the agents provided names of engineers to help work on the system and promised to provide specific software for the systems being sold. Lastly, Al-Yawer suggested that the ICE Agent who worked on Hanna's prosecution, Brian Wallace, had knowledge of the CIA's involvement, and Al-Yawer had "felt more comfortable" speaking with Wallace about Hanna after Wallace indicated he had seen the CIA file.

The motion asked for further discovery and a hearing based on this evidence in two respects: first, it argued these declarations themselves constituted newly-discovered evidence justifying a new trial; and second, that because Al-Yawer suggested the prosecution knew of the CIA's involvement, relief under *Brady v. Maryland*, 373 U.S. 83 (1963), was appropriate.  The government responded in opposition to both, though the response to the *Brady* argument was heard in another *ex parte, in camera* hearing.

The district court denied the motion for a new trial on August 26, 2009, in an opinion from the bench. On the *Brady* issue, the district judge stated that she reviewed the classified information prior to trial and determined it was not material to the preparation of the defense.  She stated that "[b]efore argument on these motions, the Court undertook a second and third review of the classified information in light of Hanna's request for a new trial," but concluded that no information should have been disclosed, and that it did not contain exculpatory or impeaching material.  "*Brady* does not require the government to supply all of the evidence in its possession that might conceivably assist with defense preparation," it concluded.  In denying the new trial, the court found that the newly-discovered evidence was discovered after trial and could not have been discovered earlier with due diligence, but that "the evidence she submitted is neither material nor likely to produce an acquittal," because it did not undermine any of the offense elements.

Hanna timely appealed.  She now disputes the denial of the motion to suppress, the exclusion of Otero's testimony, the application of the national security sentencing enhancement, and the denial of her motion for new trial.

## II.  MOTION TO SUPPRESS

*PROBABLE CAUSE*

Hanna first argues that the probable cause showing of the affidavit was predicated upon reckless or intentional misstatements of fact: that despite the affidavit's assertions, "Walied Al-Aly" is not the name of a Dresser agent, and the letter found in TIGS' trash was not, in fact, a letter at all, but instead "manifestly a fraud."

In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court held that if an affidavit supporting a search warrant contains knowingly- or recklessly-made false statements, evidence obtained pursuant to that warrant cannot be used at trial if that false information was necessary to a finding of probable cause. *Id.* at 155-56. Hanna argues that the government intentionally or recklessly stated that Walied Al-Aly was the name of a Dresser agent, when it is not, and that the piece of paper from the trash was a "letter," when it was not. She also argues that the district court improperly characterized the errors as "omissions," not "misstatements," therefore requiring "additional hurdles" to be met.

Importantly, *Franks* states that the Fourth Amendment requires that a hearing be held, "where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for truth, was included by the affiant in the warrant affidavit." *Id.* at 155-56. Therefore, the district court recognized, it was Hanna's burden to show that Wallace (the affiant) *knowingly* or *recklessly* "made false statements or material omissions." The court concluded that Hanna simply did not meet this burden: "Wallace correctly quoted the July 2003 email/letter indicating goods have been shipped to Iraq. The affidavit spells the name 'Al-Aly,' the way it was spelled in the email/letter. . . . [T]here is no evidence that the affiant noticed the spelling variation or that he thought it was significant." Without demonstrating intentional conduct, the "presumption of validity" that courts afford affidavits is not overcome. "Allegations of negligence or innocent mistake are insufficient." *Id.* at 171.

Moreover, neither of the alleged "misstatements" were really misstatements at all. First, Hanna argues that the "letter" found in the TIGS trash was not a letter, because it was not on Dresser letterhead—as the certificate documents had been—and because it was "an unaddressed attachment" to an email between Al-Yawer and Hanna, not a communication between Walid Al-Ali and Charle. This argument is meritless. First, Hanna concedes the point when she states that a letter is "a communication between a sender and a recipient." This letter, between "Al-Aly" and "[t]he 'Charles' to whom the

letter is addressed," is a communication between these two parties. It begins with a salutation ("Dear Charles"), contains a message, and signs off in a traditional way ("Sincerely yours,"). The fact that this letter was then forwarded to other parties does not change the fact that it is, in fact, a letter. As the district court determined, "the fact that the letter is on plain paper is explained by the fact that the items recovered in the trash were email messages." Ultimately, the fact that different parties may disagree about whether the letter was sufficiently formal does not mean the characterization of the item as a "letter" was a misstatement, much less an intentional one.

Second, the district judge stated that the difference between "Walid Al-Ali" and "Walied Al-Aly" "is not so noteworthy or unusual to suggest fraud." She noted that the difference may reflect that one was written by an assistant whose first language was not English. It is also possible that the name translates more than one way from Arabic to English. The affidavit correctly quoted the spelling of the name in the letter, and though Hanna states that "Walied Al-Aly" is not the name of a Dresser agent, she cannot demonstrate that this is the case. In fact, "the warrant search yielded a copy of the email/letter as an attachment to email messages between Defendants and [Al-]Yawer," demonstrating both that it did come from that Dresser agent, and that the contention of fraud is groundless.

Therefore, neither qualified as a "misstatement." However, the *Franks* doctrine applies to omissions as well, *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir. 1997), though "an affidavit which omits potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Id.* (citing *United States v. Martin*, 920 F.2d 393, 398 (6th Cir. 1990)). "[T]o require that all potentially exculpatory evidence be included in an affidavit[] places an extraordinary burden on law enforcement officers . . . ." *Mays v. Dayton*, 134 F.3d 809, 816 (6th Cir. 1998). As the district court recognized, when mere omissions are at issue, "additional hurdles must be met." Specifically, *Franks* is "inapplicable to the omission of disputed facts," except in the "*very* rare case where the defendant makes a strong preliminary showing that the affiant *with an intention to*

*mislead* excluded critical information from the affidavit, and the omission is critical to the finding of probable cause." *Id.* at 816 (emphasis in original).

Here, the district court assessed whether Wallace's "failure to mention the different spelling of Aly's name" was a material omission—i.e., constituted reckless disregard for the truth. The court correctly found that Hanna could make no such showing. The affidavit was quoted correctly, the individuals in the investigation knew an individual by that name, and therefore the "failure to detect or point out the variation in spelling is at most negligent."

In any event, the district court concluded its decision by stating that the evidence "judged on the totality of the circumstances and in a reasonable and common sense manner" would have provided a sufficient basis to establish probable cause, even if the defendant's desired changes had been made in the affidavit. Given the many sources of evidence provided in the affidavit, the affidavit gave the magistrate judge grounds for a decision that "there is a fair probability that contraband or evidence of a crime [would] be found" in the requested locations. *United States v. Lapsins*, 570 F.3d 758, 763-64 (6th Cir. 2009) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)).

*OVERBREADTH CHALLENGE*

Hanna next argues that even if the affidavit provided probable cause, the warrants themselves were overbroad. She asserts that they authorized an "all records" search, and should have been limited to searches involving foreign trade, or to certain filters on the "subject line and header" information on emails to only obtain communications on certain matters or from particular persons or places.

The Fourth Amendment to the Constitution requires that a warrant describe with particularity the items to be seized, *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), so as "to prevent the use of general warrants authorizing wide-ranging rummaging searches" that violate the prohibition against unreasonable searches and seizures. *United States v. Logan,* 250 F.3d 350, 364 (6th Cir. 2001). Therefore, the

scope of a warrant should be confined to evidence relating to a specific crime, supported by probable cause.

However, "[w]hile a general order to explore and rummage is not permitted, the degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) (internal quotations and citation omitted). Therefore, "a description is 'valid if it is as specific as the circumstances and the nature of the activity under investigation permit.'" *Id.* (quoting *United States v. Ables*, 167 F.3d 1021, 1033 (6th Cir. 1999)). Furthermore, "infirmity due to overbreadth does not doom the entire warrant; rather, it requires the suppression of evidence seized pursuant to that part of the warrant . . . but does not require the suppression of anything described in the valid portions." *Id.* (internal quotations omitted).

Turning first to the warrant authorizing the search of the TIGS premises, Hanna argues it was overbroad, as it could have been limited but was not. The government counters that the search was, in fact, tailored to the investigation at hand. It asserts that limitations on the subject matter and time limit of the materials ("records or documents, referencing or related to the purchase of computer, telecommunications or related equipment and materials, for the period January 1, 2001, to the present (June 2004)") made the TIGS search sufficiently tailored. The government argues the search was further narrowed to specify "seven distinct categories" of documents. Therefore, it asserts there were "temporal limits," "subject matter limits," and "categorical limits" on the items that could be searched and seized.

Hanna contends these limitations were insufficient, and that the search should have been limited to search the subject and address lines of emails for indications that the messages related to the investigation. We disagree. A search must be limited based on the "circumstances and nature of [the] activity under investigation permit." *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) (internal quotations omitted). Here, the activity was a complex plan for shipments going between many parties, through multiple destinations, at different times. The government did not yet know all

of the individuals or companies involved.  It also did not know where materials were coming from, or the path these items took prior to reaching their final destination.  We have allowed the search of electronic files beyond their titles, recognizing the risk of "shielded" evidence otherwise, *see, e.g., Guest v. Leis*, 255 F.3d 325, 335 (6th Cir. 2001), and have upheld lists of "broadly worded categories of items to be seized," such as bank statements, letters of credit, and other documents. *Ables*, 167 F.3d at 1033-34; *see also United States v. Meeks*, 290 F.App'x 896, 903 (6th Cir. 2008) (upholding search warrant for "computer equipment and computer-related materials," because this was "as specific as the circumstances allowed, given the information investigators had").

The government had probable cause to suspect that telecommunications and computer items were involved, and the TIGS warrant was limited to specifically target such items.  The warrants were also limited to searches of the person and company it suspected was involved—TIGS and specifically, Hanna—and only during the time period that the evidence suggested the activity occurred—between 2001 and 2004.  The tailoring of the warrant in this way was sufficient.  The warrant did not, as written, seek to discover information regarding *all* of TIGS' business.  Instead, the search was broad enough to search for evidence of what was suspected to be a broad and covert scheme, while narrow enough to limit the search to the activity in question.

The district court adequately discussed these considerations.  "The seizures in Chicago and London show that TIGS acquired equipment from a variety of suppliers in the U.S. and abroad.  Therefore, to limit the search to 'foreign trade,' as suggested by Defendants, would have eliminated items relating to the shipments detained in Chicago." *United States v. Hanna*, No.  07-CR-20355, 2008 WL 2478330, at *6 (E.D. Mich.  June 17, 2008).  Furthermore, "[s]ubject lines are often blank or cryptic.  Given the illegality of shipments to Iraq, it is unlikely that the subject line would contain information in that regard.  To require such a pinpointed computer search restricting the search to . . . specific terms, would likely have failed . . . to capture the evidence sought." *Id.*  Lastly, "limiting the search to particular senders and recipients of e-mail would hamper the search for evidence tying defendants to illegal trade with Iraq." *Id.*  We find that the

TIGS warrant was not overbroad, and that the district court correctly denied the motion to suppress on that ground.

While the warrant regarding Hanna's AOL email account is a closer question, we need not reach that issue because any error in failing to suppress evidence from that warrant was harmless. "[I]nfirmity due to overbreadth does not doom the entire warrant; rather, it 'requires the suppression of evidence seized pursuant to that part of the warrant . . . but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized [])." *Greene*, 250 F.3d at 477 (internal quotations omitted). The government notes that "no documents from [the AOL] account were used at trial," but even if information from that account had been used in the investigation, it would have been lawfully acquired even if the AOL warrant was limited in the same ways as the TIGS warrant: by including the same date limitations and subject matter restrictions. Therefore, any overbreadth in the AOL warrant was harmless.[4]

### III.  MOTION IN LIMINE - OTERO'S TESTIMONY

Hanna argues that the district court erred in granting the government's motion in limine, to exclude the testimony of Juan Otero, the general counsel of Stratex. She contended that Otero's testimony was admissible and relevant, as he would testify that Stratex was "tricked" by Walid Al-Ali and Emad Al-Yawer in a similar way to how Hanna claims to have been tricked. However, the district court found the evidence was

---

[4]Furthermore, the government could have acquired the AOL account communications without the use of a warrant at all. It is clear that all of the conduct that formed the basis of Hanna's conviction was completed by March 2003, when the last TIGS shipment was seized by British customs. The government sought the warrant for Hanna's personal AOL email account in June 2004. The law in effect at that time provided that a governmental entity need not obtain a warrant for such emails, but instead could compel an internet service provider to disclose the contents of email communications at least 180 days old through a simple subpoena. 18 U.S.C. § 2703(d) ("Stored Communications Act"); *Guest v. Leis*, 255 F.3d 325, 338-39 (6th Cir. 2001) (stating that the government can obtain such documents through a warrant, subpoena, or court order), *called into question by United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010) (holding that the government may not compel a commercial ISP to turn over the contents of a subscriber's emails without first obtaining a warrant based on probable cause). Though this Court has subsequently held that such emails can only be acquired by a warrant, *Warshak*, 631 F.3d at 286, these same emails would not have been excluded if obtained by subpoena because the officers obtaining them would have acted in good-faith reliance upon the Stored Communications Act. *See id.* at 292. Therefore, because the information from that account could have properly been admitted at trial, any overbreadth in the AOL search warrant was harmless.

not relevant, because "even if this company was duped," it had no relevance to Hanna, her small company, and its separate dealings with Al-Yawer.

This court reviews a district court's admission of evidence and its relevance determinations for an abuse of discretion. *United States v. White*, 560 F.3d 184, 191 (6th Cir. 2009). A determination that evidence was irrelevant and therefore inadmissible must be upheld "absent a clear abuse of discretion." *United States v. Thomas*, 74 F.3d 701, 714 (6th Cir. 1996). However, "[i]n reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum prejudicial value." *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003) (quoting *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir. 1988)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED. R. EVID. 401. "The standard for relevancy is 'extremely liberal' under the Federal Rules of Evidence." *Dortch v. Fowler*, 588 F.3d 396, 400 (6th Cir. 2009) (quoting *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006)). Arguably, testimony from Otero, whose company did business with the same companies—and individuals—as Hanna and TIGS, and who claims to have been duped—in the same manner as Hanna—could have been considered relevant. However, the exclusion of this evidence was not a clear abuse of discretion. The district court relied upon the fact that Otero and TIGS represented unrelated parties and transactions, and that Stratex was a large company while TIGS was a small one, and concluded that Stratex's experience does not reflect upon Hanna or TIGS' knowledge of their own shipments' destinations. This determination is a reasonable one. Moreover, any finding of an abuse of discretion would be subject to harmless error analysis, FED. R. CIV. P. 61, requiring the defendant to prove that the error affected her substantial rights—a standard Hanna cannot meet. Given the extensive testimony and physical evidence on the issue of Hanna's personal knowledge—including emails from Hanna herself mentioning Iraq and forged documents—the admission of Otero's testimony would not have altered the

jury's determination that Hanna, unlike Stratex, did know where her shipments were headed. Therefore, we affirm the district court's exclusion of Otero's testimony.

### IV.  SENTENCING - NATIONAL SECURITY ENHANCEMENT

Hanna next argues that the trial court erred in applying the "national security" enhancement of U.S.S.G. § 2S1.1(b)(1)(iii), because the record would not support a factual finding that Hanna "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . an offense involving . . . national security." We find no error in the district court's addition of this sentencing enhancement. However, the district court did err in its sentencing calculation, but not for the reasons that Hanna asserts. The district court improperly declined to sentence Hanna under U.S.S.G. § 2S1.1(a)(1), instead electing to proceed under subsection (a)(2). Because the district court's error was induced by the defendant herself, it is invited error and does not warrant reversal.

*SENTENCING STATUTE FOR MONEY LAUNDERING*

The indictment in this case involved several counts, of which Hanna was convicted of all but one. However, for sentencing purposes, Count Eight—money laundering under 18 U.S.C. § 1956(h)—was used because the money laundering guidelines were the highest. *See* U.S.S.G. § 3D1.3(a). Therefore, for sentencing purposes, U.S.S.G. § 2S1.1, "Laundering of Monetary Instruments . . ." was applicable. It states:

> (a) Base Offense Level:
>
>> (1) The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of § 1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or
>>
>> (2) 8 plus the number of offense levels from the table in § 2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

(b) Specific Offense Characteristics

(1) If (A) subsection (a)(2) applies; and (B) the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture, importation, or distribution of a controlled substance or a listed chemical; (ii) a crime of violence; or (iii) an offense involving firearms, explosives, national security, or the sexual exploitation of a minor, increase by 6 levels.

U.S.S.G. § 2S1.1(a)(1)-(b)(1).  Under subsection (a)(1), the offense level for sentencing is that of the underlying offense, as long as the "level for that offense can be determined." *Id.* § 2S1.1(a)(1).  Judges "determine" the offense level for the underlying offense by looking to Appendix A of the Guidelines.  Appendix A provides an exhaustive list of statutes, and a district judge's task is simply to locate the relevant statute of conviction, then determine which Guideline section is applicable.  Subsection (a)(2) only applies "otherwise"—when the level cannot be determined because it is not listed in Appendix A— in which case, a calculation based on the "value of the laundered funds" must be completed.  *Id*. § 2S1.1(a)(2).

*STATUTE OF CONVICTION AND CORRESPONDING GUIDELINE*

The "underlying offense" for Hanna's money laundering conviction was that "from which the laundered funds were derived."  Here, that is Hanna's convictions for shipments in violation of the Iraq embargo, which the indictment lists as violations of 50 U.S.C. § 1705(b).  Sections 1701 through 1706 of Title 50 of the United States Code are known as the International Emergency Economic Powers Act ("IEEPA").  IEEPA grants powers to the President to "deal with any unusual and extraordinary threat" to "the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701.  However, § 1701 then contains Notes, which are codified versions of the Executive Orders and Public Laws of Congress, laying out the embargos, regulations, and prohibitions that have been implemented relating to various nations.  Section 1705, the section under which Hanna's conviction is listed, is actually the "Penalties" provision of this broader statute.  It simply states "[i]t shall be unlawful for a person to violate, attempt to violate,

conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and describes the penalties for such an act. Importantly, this section simply states that certain conduct is unlawful when it violates an order, regulation, or prohibition established elsewhere in the chapter. Essentially, IEEPA is an umbrella statute, which an individual violates if they act in violation of any order or regulation under its authority.

In this case, President George H.W. Bush issued Executive Order 12722 in 1990, finding "that the policies and actions of the Government of Iraq constitute an unusual and extraordinary threat to the national security and foreign policy of the United States." Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990). The embargo put in place by this Executive Order is the basis for Hanna's prosecution and conviction. Congress then passed the Iraq Sanctions Act of 1990 to declare support for the President's actions in relation to Iraq. Pub. L. No. 101-513, § 586A(5) (1990). This law contained the details, prohibitions, and penalties for violation of the Iraq embargo. The Executive Order and Public Law were codified, along with all the others, as a Note to 50 U.S.C. § 1701.[5]

However, while Hanna's conduct seems to have actually violated prohibitions listed in § 1701, Hanna's indictment lists—and therefore the "underlying conviction" for purposes of sentencing appears to be—§ 1705 of IEEPA specifically. Therefore, the district court looked to Appendix A, where only one Sentencing Guideline is listed as corresponding with that statutory section: U.S.S.G. § 2M5.3. But § 2M5.3 is entitled, "Providing Material Support or Resources to Designated Foreign Terrorist Organizations or Specially Designated Global Terrorists, or For a Terrorist Purpose." Not surprisingly, Hanna objected to the employment of this provision, and its listed Base Offense Level

---

[5]Importantly, this Law was intended to be treated separately from § 1705. It states that "[n]otwithstanding section 206 of the International Emergency Economic Powers Act (50 U.S.C. 1705) [section 1705 of this title] . . . whoever, after the date of enactment of this Act, willfully violates or evades or attempts to violate or evade Executive Order Numbered 12722 . . . or any license, order, or regulation issued under any such Executive order . . . shall, upon conviction, be fined not more than $1,000,000, be imprisoned for not more than 12 years, or both." Pub. L. No. 101-513, § 586E (codified within § 1701). While the statutory maximum that controls in this case is that of money laundering, which has a statutory maximum of 20 years (see 18 U.S.C. § 1956(a)(1)(B)), it is important that this Note to § 1701 lays out the criminalization and penalties of embargo violations.

of 26, on the grounds that this description in no way applies to the conduct of which she was convicted. The government seemed to concede that this section does not match her conduct, and the district court, at sentencing, agreed.

*AMENDMENT 591*

The problem here arises because of an Amendment to the Guidelines in 2000. Prior to that time, Appendix A's introductory notes contained an exception: "If, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." Amendment 591 changed all this. The amendment was "intended to emphasize that the sentencing court *must* apply the offense guideline referenced in the Statutory Index for the statute of conviction." U.S.S.G. Manual, Supp. to App. C., Amendment 591 (Nov. 1, 2000) at 32 (emphasis added); *see United States v. Shepherd*, 83 F.App'x 88, 89 (6th Cir. 2003).

*THE DISTRICT COURT'S SENTENCING DECISION*

Before Amendment 591, the district judge could have taken Hanna's case and subjectively determined which Guideline section was appropriate; now, the judge no longer has that discretion. But here, the district judge neither applied what seemed to be the required section, nor chose another one. She concluded that § 2M5.3 is not appropriate for this case, but also acknowledged that she couldn't "pick and choose." Instead, she decided this meant that she could not "determine" the offense level for a § 1705 violation (as required by U.S.S.G. § 2S1.1(a)(1)), and she therefore stated she would have to move on to subsection (a)(2) of the sentencing provision and calculate the offense level based on the total amount of laundered funds.[6]

---

[6]Here, the district judge did not use the "total" amount of laundered funds, $9.5 million; instead, she subtracted the amounts that eventually went "back to Yawer," leaving $3.3 million. This led her to "add 18," bringing the base level to 26. We do not decide whether this calculation was correct.

The district judge found that the base offense level, after that calculation, was 26. She also added two, two-level enhancements based on "obstruction of justice" and money laundering, bringing the count to 30. But because she calculated the base offense level using subsection (a)(2), she wasn't done. U.S.S.G. § 2S1.1(b)(1) then states, "If (A) subsection (a)(2) applies, and (B) the defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . (iii) an offense involving . . . national security. . . increase by 6 levels." Based on this, the district court determined that an additional six-level increase was warranted, bringing the total count to 36. Based on this total offense level, the district judge found Hanna had a Sentencing Guideline range of 188-235 months. *See* U.S.S.G. Sent. Table, Ch. 5, Pt. A. It is this application of the "involving . . . national security" enhancement that Hanna objects to in her case.

*THE APPROPRIATE SENTENCING PROVISION*

The district court did err in its sentencing analysis, but it did so long before it reached the enhancement that Hanna now appeals. Under U.S.S.G. § 2S1.1(a)(1), the district judge is *required* to use the Base Offense Level for the underlying offense if it can be determined. Here, the district judge found that the result in Appendix A was inappropriate, and did not apply it. But the district judge is not free to ignore subsection (a)(1) in favor of (a)(2), just as she is no longer free to ignore subsection (a)(1) and Appendix A's Guideline section in favor of another.

The district court was required to apply the sentencing provision corresponding to Hanna's conviction. Hanna was convicted for violating IEEPA generally, and the Iraq embargo found in § 1701 specifically. Though the indictment lists the Penalties provision, § 1705, as the statute of conviction, this seems to be an anomaly. No other case involving an embargo violation under IEEPA—in any circuit—has charged the defendant under § 1705 specifically, or sentenced them under the corresponding Guideline Section, § 2M5.3. Instead, all cases treat such embargo violations as violations of IEEPA generally, discuss them as convictions under § 1701, and apply

Appendix A accordingly.[7]  That is precisely what should have been done in this case. Under Appendix A, the corresponding Sentencing Guideline sections for violation of § 1701 are §§ 2M5.1, 2M5.2, or 2M5.3.  Appropriately, § 2M5.1 is entitled "Evasion of Export Controls; Financial Transactions with Countries Supporting International Terrorism."  Therefore, Hanna's conviction for violation of IEEPA requires the application of U.S.S.G. § 2M5.1.  It states:

> (a) Base Offense Level (Apply the greater):
>
>> (1) 26, if (A) national security controls . . . were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism; or
>>
>> (2) 14, otherwise.

U.S.S.G. § 2M5.1.  Though Hanna currently objects to the application of the sentencing enhancement for "an offense involving . . . national security," she does not also argue the inapplicability of this provision regarding when "national security controls . . . were evaded."  In fact, her brief states:

> The trial judge's first conclusion, that the embargo in question was "basically a control device," seems unexceptional—what else, after all, is an embargo? Equally unexceptionable [sic] is her next statement, that it is "not necessary that there be actual knowledge of a threat to security in order to violate" such an embargo—indeed, there is nothing in the statute which criminalizes embargo violations . . . which requires proof of a threat to national security.

Appellant Br. at 56-57.

---

[7]For example, in *United States v. Elashyi*, 554 F.3d 480 (5th Cir. 2008), the defendants were illegally exporting computer equipment to Libya and Syria, as well as laundering funds derived from these exports.  The grand jury charged them with violations of "International Emergency Economic Powers Act ('IEEPA'), 50 U.S.C. §§ 1701-1707 (2006)." *Id.* at 491.  The court acknowledged that "[u]nder IEEPA, it is a crime to willfully violate Executive Order 12947," and even cited 50 U.S.C. § 1705 for this proposition. *Id.* at 498.  However, the court went on to evaluate sentencing—by discussing the application of § 2M5.1. *See id.* at 508-09.  Likewise, in *United States v. Shaaban*, 252 F. App'x 744 (7th Cir. 2007), the defendant was charged with "traveling to Iraq in violation of the International Emergency Economic Powers Act, *see* 50 U.S.C. § 1701." *Id.* at 746.  "To calculate the offense level, the probation officer started with a base offense level of 26, *see* U.S.S.G. § 2M5.1(a)(1)(B) . . ." *Id.*  Likewise, in *United States v. McKeeve*, No. 96-2273, 131 F.3d 1 (1st Cir. Dec. 5, 1997), the grand jury indicted the defendant on charges that he "knowingly violated the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1706 (1994), and its associated Executive Orders and regulations . . . *reprinted in* 50 U.S.C. § 1701 note." *Id.* at *6.  The court then stated that the applicable Sentencing Guidelines were in U.S.S.G. § 2M5.1. *Id.* at *14.

Hanna's conduct clearly qualifies for the enhanced Base Offense Level of 26 under § 2M5.1. This is because in Executive Orders like the Iraq embargo, the President determines that a particular country poses a "threat to the national security" of the country, and therefore orders an embargo. "Every court to consider the issue has held that the evasion of [such] sanctions" are "national security controls." *Elashyi*, 554 F.3d at 508 (citing *McKeeve*, 131 F.3d 1, at \*14; *United States v. Shetterly*, 97 F.2d 67, 76 (7th Cir. 1992)). Put simply, "section 2M5.1(a)(1) applies to any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods actually are intended for some innocent use." *McKeeve*, 131 F.3d 1, at \*14. The proper base offense level for Hanna's sentence was 26 under § 2M5.1.[8]

At first glance, it may seem that this error was harmless, for the district court concluded (after its calculation of the laundered funds) that the base offense level was 26. But this is far from harmless. Because the district judge instead calculated the base level under U.S.S.G. § 2S1.1(a)(2), she then went on to subsection (b)(1)—required when "subsection (a)(2) applies"— and added the additional six-level increase which prompted Hanna's current objection. However, if the district court had determined the base offense level properly through subsection (a)(1), the offense level listed in § 2M5.1 would have been Hanna's base offense level. There would be no addition of a six-level increase, because subsection (b)(1) would not apply. Thus, Hanna's proper offense level would be 26 (base offense under § 2M5.1), plus 2 (for obstruction), plus 2 (for money laundering), for a total of 30. Instead of the Guideline range of 188-235 months that the district court found, the correct range would have been 97-121 months.

However, the district court's decision below to sentence Hanna under § 2S1.1(a)(2) was directly in response to Hanna's urging that it take that very course. As Hanna's counsel has conceded, the doctrine of "invited error" therefore precludes reliance on this error as grounds for reversal. *See, e.g., Ford v. County of Grand Traverse*, 535 F.3d 483, 490-91 (6th Cir. 2008) ("Having induced the court to rely on a

---

[8]We note that even if the court applied the sentencing provision corresponding to violation of the Penalties provision, § 1705, it would require application of U.S.S.G. § 2M5.3, still resulting in a base offense level of 26.

particular erroneous proposition of law or fact, a party in the normal case may not at a later stage of the case use the error to set aside the immediate consequences of the error."); *United States v. Sharpe*, 996 F.2d 125, 128-29 (6th Cir. 1993) ("[N]ot even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request . . ." (internal quotation omitted)).  Therefore, though the district court erred in its sentencing analysis, we decline to remand on that ground.

Finally, we address Hanna's contention that after the court chose to sentence Hanna under U.S.S.G. § 2S1.1(a)(2), it erred in determining that Hanna "knew or believed that any of the laundered funds were the proceeds of, or were intended to promote . . . (iii) an offense involving . . . national security," U.S.S.G. § 2S1.1(b)(1), and adding the corresponding six-level enhancement.  However, we find no error in this determination by the district court.  The jury was required to find that Hanna knew her shipments were destined for Iraq in order to convict her.  Hanna knew that the laundered funds "were the proceeds of" these shipments.  It is uncontested that Hanna also knew about the embargo on shipments to Iraq.  The Executive Order implementing the Iraq embargo clearly stated that the embargo was implemented as part of a "national emergency" to deal with the "threat to the national security and foreign policy of the United States" that Iraq's policies and actions represent.  Exec. Order No. 12722, 55 Fed. Reg. 31803 (Aug. 2, 1990).  Therefore, because the embargo was implemented to deal with a national security threat, any violation of the embargo is necessarily an offense that "involves" national security.  Because Hanna knew that the laundered funds were the proceeds of her Iraq embargo violation, she had knowledge that the money was derived from an offense "involving" national security.  Though no one asserts that Hanna believed her exports would "threaten" national security, that is not required under the sentencing provision: it merely requires that she knew the offense "involved" national security—we find that any violation of the embargo inherently does so.  Therefore, the district court's imposition of the six-level enhancement is **AFFIRMED**.

## V.  MOTION FOR NEW TRIAL

Hanna's last remaining argument is that the district court erred in denying her motion for a new trial.  More specifically, she actually makes three separate claims: (1) the judge erred in deciding the motion based on *ex parte, in camera* submissions without making them available to the defense; (2) the withheld information, as well as the newly-discovered information, constitute *Brady* violations; and (3) the judge erred in denying the motion for new trial, based on an incorrect, overly restrictive construction of "materiality."

*IN CAMERA, EX PARTE PROCEEDINGS*

Section 4 of CIPA states that if a district court grants a protective order on the government's motion, "the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal." 18 U.S.C. app. 3 § 4.  Similarly, § 6 states that if an *in camera* hearing is held, "the record of such in camera hearing shall be sealed and preserved by the court for use in the event of an appeal" as well.  *Id.* § 6(d).  This Court has reviewed all sealed documents considered below, as well as the filings and transcripts from the *ex parte* hearings.

Hanna asserts that the district court abused its discretion when it considered the government's filings *ex parte* and *in camera*.  This claim is without merit.  Federal Rule of Criminal Procedure 16(d)(1) states that "[a]t any time, the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief," as well as "permit a party to show good cause by a written statement that the court will inspect *ex parte*." Simply, holding such proceedings is within the discretion of the court. Additionally, as the government points out, the Advisory Committee Notes for this Rule state that "among the considerations" in a Rule 16(d)(1) motion is "the protection of information vital to the national security." Rule 16 Adv. Comm. Notes, Sub. (e) (1966).

More importantly, CIPA itself provides for precisely the type of proceedings that occurred in this case.  Section 4 of CIPA states:

> The court, upon a sufficient showing, may authorize the United States to delete specified items of classified information from documents to be made available to the defendant through discovery under the Federal Rules of Criminal Procedure, to substitute a summary of the information for such classified documents, or to substitute a statement admitting relevant facts that the classified information would tend to prove. The court may permit the United States to make a request for such authorization in the form of a written statement to be inspected by the court alone. If the court enters an order granting relief following such an *ex parte* showing, the entire text of the statement of the United States shall be sealed and preserved in the records of the court to be made available to the appellate court in the event of an appeal.

18 U.S.C. app. 3 § 4. This court has already stated that CIPA "permits the government to have the trial court examine classified information *in camera* and *ex parte* and determine whether it is necessary for the defense." *United States v. Smith*, 899 F.2d 564, 565 n.1 (6th Cir. 1990). Therefore, the district court's decision in this case to hold such hearings for both the protective order and the motion for new trial is reviewed for an abuse of discretion. *United States v. Napue*, 834 F.2d 1311, 1316 (7th Cir. 1987).

CIPA does not itself create a government privilege against the disclosure of classified information; it presupposes one. Section 4 allows the government to forego presenting certain evidence to the defendant "upon a sufficient showing." Specifically, a protective order will only issue against disclosure of "classified information," 18 U.S.C. app. 3 § 3, and "classified information" is "information or material that has been determined by the United States Government . . . to require protection against unauthorized disclosure for reasons of national security." *Id.* § 1.

We recognize that even information entitled to such privilege "must give way under some circumstances to a criminal defendant's right to present a meaningful defense." *United States v. Aref*, 533 F.3d 72, 79 (2d Cir. 2008). Because of this, a district court withholding evidence under CIPA must first determine whether the material in dispute is discoverable, then whether the material is privileged, but then determine if the information is "at least 'helpful to the defense.'" *United States v. Yunis*, 867 F.2d 617, 623 (D.C. Cir. 1989) (quoting *Rovario v. United States*, 353 U.S. 53, 60-61 (1957)); *accord United States v. Stewart*, 590 F.3d 93, 131 (2d Cir. 2009).

This court has reviewed all of the information that was presented to the district judge *ex parte* and *in camera*, as well as the proceedings at those hearings. We conclude that the withheld information was properly found to be privileged. Moreover, we conclude that the information would not be helpful to the defense. We therefore hold that the district judge's decisions to exclude the defendant from the protective order hearing and to withhold the information in its entirety were within her discretion.

*BRADY CLAIMS*

Hanna asserts two grounds for a *Brady* violation. First, she asserts that there is reason to believe that the new evidence she put forth, in the form of testimony from Attar and Al-Yawer, was known to the prosecution and constitutes *Brady* material that should have been disclosed. Second, she argues that the government's *ex parte* response to her motion indicates that "relevant 'information' relating to the CIA's involvement is indeed in the government's possession," and therefore the separate, confidential evidence that was withheld under CIPA might also constitute a *Brady* violation. Her brief asserts that the district court used the wrong standard for "materiality" and therefore wrongly denied her *Brady* and new trial claims.

*Brady v. Maryland* requires disclosure of evidence by the prosecution when it is both favorable to the accused and "material either to guilt or to punishment." 373 U.S. 83, 87 (1963). *Brady* violations have three elements: "[1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] the evidence must have been suppressed by the State, either willfully or inadvertently, and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

Evidence is exculpatory if it is "material" and "would have a bearing upon the guilt or innocence of the defendant." *Mays v. City of Dayton*, 134 F.3d 809, 815 (6th Cir. 1998) (citing *Brady*, 373 U.S. at 87). "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Such a "reasonable probability" must be one "sufficient to undermine

confidence in the outcome." *Id.* In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Court "emphasize[d] that materiality is not determined by looking at the sufficiency of the evidence; rather we must determine whether the favorable evidence could reasonably be viewed as putting the entire case 'in such a different light as to undermine confidence in the verdict.'" *Spirko v. Mitchell*, 368 F.3d 603, 609 (6th Cir. 2004) (quoting *Kyles*, 514 U.S. at 435).

However, there is no constitutional duty of a prosecutor to disclose "everything that might influence a jury." *United States v. Agurs*, 427 U.S. 97, 109 (1976). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* at 109-10. Instead, the evidence must be "material either to guilt or to punishment." *Brady*, 373 U.S. at 87.

In regard to all withheld confidential evidence, we agree with the district judge that "even in hindsight, there's no information that should have been disclosed to defense counsel and an evidentiary hearing would be fruitless." The withheld information was not exculpatory and did not advance Hanna's theory that the government approved and assisted with the shipments.

However, Hanna takes it one step further: she asserts that "since the appropriate inquiry requires the court to determine [the effect the withheld information would have on the defense], it seems especially appropriate to require disclosure to the defense. . ." This argument is without merit. While CIPA and constitutional standards contemplate that all records will be made available to a reviewing court in order to assess decisions made below, that does not mean that the materials properly withheld in the district court must be disclosed to the defense, so that they, too, can assess the information. *See Yunis*, 867 F.2d at 623-24; *Stewart*, 590 F.3d at 132. Instead, this Court has fully undertaken its duty by reviewing the confidential information and reaching a conclusion as to its legal significance.

As to the newly-discovered information, it also does not rise to the level of a *Brady* violation. The information alleged by Attar and Al-Yawer was not impeaching

evidence, nor was it exculpatory: it does not—directly or indirectly—tend to negate any element of any offense, nor raise a possible legal defense, and therefore has no bearing on her guilt or innocence. It also simply is not "material either to guilt or to punishment." *Brady*, 373 U.S. at 87. Information alleging the government's knowledge of the TIGS shipments might have made some feel uneasy about Hanna's prosecution regarding those shipments, but since the shipments were illegal and Hanna did not even know of the alleged government involvement, these facts have no bearing on her guilt. As the Supreme Court has recognized, "a jury's appraisal of a case 'might' be affected by an improper or trivial consideration as well as by evidence giving rise to a legitimate doubt on the issue of guilt." *Agurs*, 427 U.S. at 108-09. The information might have been interesting for a jury to hear, but a prosecutor's duty is not so broad as to require him to "disclose any information that might affect the jury's verdict." *Id.* at 108. Therefore, no *Brady* violation occurred in this case.

*MOTION FOR NEW TRIAL*

Hanna argues that the district court improperly denied her motion for a new trial. She argues that "[t]he basis of the theory of criminality embodied by the Indictment is that the shipments . . . were rendered unlawful by Executive Order," and that the newly-discovered information (in the form of statements from Attar and Al-Yawer) indicates that "agents of the Executive actually endorsed, encouraged, and assisted" these shipments instead. She contends this impacts the criminality of her actions. She also argues that, even if this Court does not accept that proposition, "had the newly discovered evidence been available and presented to the jury, the case against Ms. Hanna would have stood on a markedly different factual footing, and either 'likely' resulted in an acquittal (the 'newly discovered evidence standard) or that the nondisclosure of the evidence 'undermines confidence in the verdict' (the *Brady* standard)."

The district judge concluded that the evidence from Attar and Al-Yawer is "neither material nor likely to produce an acquittal," because "it does not undermine the establishment of the elements of the offense for which she was convicted or create[] an affirmative defense to the crimes for which she was convicted." She noted that none of

the U.S. agents, nor either of the new witnesses, ever spoke to Hanna about the U.S. agents' involvement.

We review a trial court's denial of a motion for new trial for an abuse of discretion. *United States v. Kelley*, 461 F.3d 817, 831 (6th Cir. 2006). If a district court "applies the incorrect legal standard, misapplies the correct legal standard, or relies upon clearly erroneous findings of fact," it has abused its discretion. *United States v. Pugh*, 405 F.3d 390, 397 (6th Cir. 2005). Otherwise, the district court is able to weigh the new evidence in assessing the four-pronged test: "the trial judge sits as a thirteenth juror" when considering a Rule 33 motion. *United States v. Solorio*, 337 F.3d 580, 589 n.6 (6th Cir. 2003).

To prevail on a motion for a new trial based on newly discovered evidence, a defendant must show that the new evidence (1) was discovered after the trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would likely produce an acquittal. *United States v. Blackwell*, 459 F.3d 739, 768 (6th Cir. 2006). The district judge enunciated this standard, and proceeded to apply it in her analysis.

Hanna correctly argues that the standard is different when a motion for new trial is based on a *Brady* violation. *See United States v. Frost*, 125 F.3d 346, 382 (6th Cir. 1997). However, because no *Brady* violation occurred, Hanna must meet the usual four-part test in order to succeed on a Rule 33 motion. We agree with the district court that Hanna failed to meet prongs three and four.

> [T]he evidence [Hanna] submitted is neither material nor likely to produce an acquittal. Specifically, it does not undermine the establishment of the elements of the offense for which she was convicted or create[] an affirmative defense to the crimes for which she was convicted. The new evidence does not call into question any of the elements . . . . The materiality element is not met because the agents made no statements to Hanna and neither declarant claims to have told Hanna about his involvement with government officials. . . . The Court totally rejects defendant's position that because the embargo was imposed by the Executive Branch, conduct to the contrary by Executive Branch agents constitutes a defense . . . . In the alternative, Hanna argues

if the jury had known a witness's deception about the destination of shipments came from fear for his own safety should others discover he cooperated with the U.S., the jury would have looked at the case differently.  This argument also does not establish an affirmative defense. . . . Although it should shift the focus of the jury and for that reason might be helpful to the defense, it does not satisfy the new trial standard.

The district court did not abuse its discretion and therefore we **AFFIRM** its denial of the motion for new trial.

## VI.  CONCLUSION

For the foregoing reasons, the judgment and sentence imposed by the district court is **AFFIRMED**.